ABIGAIL M. ROBERSON, an Infant, by MARGARET E. BELL, her Guardian ad Litem, Respondent, *v.* THE ROCHESTER FOLDING BOX COMPANY et al., Appellants.

1. EQUITY — RIGHT OF PRIVACY NOT ENFORCEABLE BY INJUNCTION. An individual's so-called right of privacy, founded upon the claim that he has the right to pass through this world, if he wills, without having his picture published, his business enterprises discussed, his successful experiments written up for the benefit of others, or his eccentricities commented upon either in handbills, circulars, catalogues, periodicals or news-

papers, and, necessarily, that the things which may not be written and published of him must not be spoken of him by his neighbors, whether the comment be favorable or otherwise, does not exist in the law and is not enforceable in equity.

2. WHEN INJUNCTION TO RESTRAIN THE USE OF LITHOGRAPHED LIKENESS OF PLAINTIFF WILL BE DENIED. An injunction cannot be granted to restrain the unauthorized publication and distribution of lithographic prints, or copies, of a photograph of a young woman as part of an advertisement of a legitimate manufactured article, where there is no allegation that the picture is libelous in any respect, but, on the contrary, the gravamen of the complaint is that the likeness is so good that it is easily recognized and that it has been and is used to attract attention to the advertisement upon which it is placed, although the publication has caused her great mental and physical distress, necessitating the employment and attendance of a physician.

*Roberson* v. *Rochester Folding Box Co.*, 64 App. Div. 30, reversed.

(Argued February 13, 1902; decided June 27, 1902.)

APPEAL, by permission, from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered July 30, 1901, affirming an interlocutory judgment in favor of plaintiff entered upon a decision of the court at Special Term overruling demurrers to the complaint.

The nature of the action, the facts, so far as material, and the questions certified are stated in the opinion.

*Elbridge L. Adams* for appellants. The complaint does not allege that the publication or circulation of the lithographic "likeness" of plaintiff was willful; or even that either of the defendants knew that it was, in fact, the portrait of plaintiff, or, indeed, of any living woman. (*Squier* v. *Press Pub. Co.*, 58 App. Div. 362; *Bogardus* v. *N. Y. Life Ins. Co.*, 101 N. Y. 329; *Valentine* v. *Lunt*, 115 N. Y. 496; *Cook* v. *Warren*, 88 N. Y. 37; *Segelken* v. *Meyer*, 94 N. Y. 473.) The complaint does not state a cause of action for libel. (*White* v. *Nichols*, 3 How. [U. S.] 66; Townshend on Libel, 2, 3, 118; Holt on Libel, 244; 1 Hilliard on Torts, ch. 7, § 13; *Root* v. *King*, 7 Cow. 613; *People* v. *Croswell*, 3 Johns. Cas. 354.) The complaint states no cause of action known to the common law, either at law or in equity. (*Pierce* v. *Pro-*

*prietors, etc.,* 10 R. I. 227; Pom. Eq. Juris. §§ 43, 57; Story's
Eq. Juris. § 14; *Manning* v. *Manning,* 1 Johns. Ch. 530;
Black. Com. 443; *Day* v. *Brownrigg,* L. R. [10 Ch. Div.]
294; *Ajello* v. *Worsley,* L. R. [1898, 1 Ch. Div.] 274;
*Donovan* v. *Finn,* 1 Hopk. Ch. 59; *Greene* v. *Keene,* 14
R. I. 388; *Kujek* v. *Goldman,* 150 N. Y. 176.) The "right
of privacy" is not a legal actionable right. (*Pollard* v.
*P. Co.,* L. R. [40 Ch. Div.] 345; *Gee* v. *Pritchard,* 2
Swanst. 402; *Abernethy* v. *Hutchinson,* 3 L. J. Ch. 209;
*Mayall* v. *Highbey,* 1 H. & C. 188; *Duke of Queensbury* v.
*Shebbeare,* 2 Eden, 329; *Dockrell* v. *Dougall,* 78 L. T. Rep.
40; *Schuyler* v. *Curtis,* 147 N. Y. 434; *Atkinson* v. *Doherty,*
121 Mich. 372; *Corliss* v. *E. W. W. Co.,* 57 Fed. Rep. 434;
*Mitchell* v. *R. Ry. Co.,* 151 N. Y. 110.) An injunction can-
not be granted in this case, for equity deals only with matters
of contract or property, and does not exercise jurisdiction in
matters of morals or conduct. (Kerr on Injunctions, 1;
High on Injunctions, § 1012; Eden on Injunctions, 295, 296;
*Woolsey* v. *Judd,* 11 How. Pr. 54; *Brandeth* v. *Lance,* 8
Paige, 24; *N. Y. J. G. Society* v. *Roosevelt,* 7 Daly, 188;
*Mauger* v. *Dick,* 55 How. Pr. 132; *B. D. Co.* v. *F. Mfg.
Co.,* 114 Mass. 169; *Francis* v. *Flynn,* 6 U. S. 1148; *Ray-
mond* v. *Russell,* 143 Mass. 295; *Whitehead* v. *Kitson,* 119
Mass. 484; *Pope* v. *Curl,* 2 Atk. 342; *Thompson* v. *Stan-
hope,* Ambler, 737; *Percival* v. *Phipps,* 2 V. & B. 19.)
The plaintiff cannot have damages, for the law takes no
cognizance of mere injury to feelings. (*Cohn* v. *Goldman,*
76 N. Y. 284; Bliss Code Pleading, § 211; *Pattison* v.
*Adams,* 7 Hill, 126; *Mitchell* v. *R. Ry. Co.,* 151 N. Y. 107;
*Chapman* v. *W. U. T. Co.,* 88 Ga. 763.)

*Milton E. Gibbs* for respondent. Defendants' use of plain-
tiff's portrait for advertising purposes, without her consent,
constitutes an unwarrantable invasion of her right of privacy
for which an action lies. (*Schuyler* v. *Curtis,* 15 N.Y. Supp.
787, 64 Hun, 594; 24 N. Y. Supp. 509; 147 N. Y. 434;
*Marks* v. *Jaffa,* 6 Misc. Rep. 290; *Pollard* v. *Photographic*

*Co.*, L. R. [40 Ch. Div.] 345 ; *Corliss* v. *Walker*, 57 Fed. Rep. 434 ; 64 Fed. Rep. 280 ; 31 L. R. A. 283 ; *Pierce* v. *Proprietors, etc.*, 10 R. I. 227.) It is not necessary that a property right should exist in order to call into action a court of equity. (*Pierce* v. *Proprietors, etc.*, 10 R. I. 227 ; *Snyder* v. *Snyder*, 60 How. Pr. 368 ; *Woolsey* v. *Judd*, 4 Duer, 379 ; *Pollard* v. *P. Co.*, L. R. [40 Ch. Div.] 345 ; 1 Story's Eq. Juris. §§ 49, 50 ; *Albert* v. *Strange*, 1 Macn. & G. 25 ; *Pope* v. *Curl*, 2 Atk. 342 ; *Gee* v. *Pritchard*, 2 Swanst. 402 ; *Percival* v. *Phipps*, 2 V. & B. 19 ; *Prince Albert* v. *Strange*, 2 DeG. & S. 652.) Every person has a property right in his own photograph, and until that right is surrendered he is its exclusive owner, and also of the additional right to make and circulate all copies of that photograph. (*Pollard* v. *P. Co.*, L. R. [40 Ch. Div.] 345 ; *Prince Albert* v. *Strange*, 1 Macn. & G. 25 ; 12 Wash. Law Rep. 353 [1884] ; *Corliss* v. *Walker*, 31 L. R. A. 283 ; *Wynehamer* v. *People*, 13 N. Y. 433 ; *Schuyler* v. *Curtiss*, 64 Hun, 596 ; *Docker* v. *Somes*, 2 M. & K. 674.) The fact that this case may be new in instance is not a sufficient reason for turning the plaintiff out of court. (*Piper* v. *Hoard*, 107 N. Y. 73 ; *Kujek* v. *Goldman*, 150 N. Y. 176 ; *Sorensen* v. *Balaban*, 11 App. Div. 164 ; *Hoefler* v. *Hoefler*, 12 App. Div. 84 ; *Marks* v. *Jaffa*, 6 Misc. Rep. 290.) The plaintiff is entitled to damages for her mental distress and annoyance, besides the recovery of the profits made by the use of her picture. (*Mayer* v. *Gordon*, 113 Ind. 282 ; 8 Am. & Eng. Ency. of Law [2d ed.], 659, 669, 672 ; Sedg. on Dam. 35 ; *Byrne* v. *Gardner*, 33 La. Ann. 6 ; *Hamilton* v. *T. A. R. R. Co.*, 53 N. Y. 28 ; *Prince* v. *Ridge*, 32 Misc. Rep. 666 ; *Lewis* v. *Hoover*, 3 Blackf. 407 ; *Newell* v. *Whitcher*, 53 Vt. 589 ; *Leach* v. *Leach*, 11 Tex. 699 ; *Barbie* v. *Reese*, 60 Miss. 906 ; *Williams* v. *Underhill*, 63 App. Div. 223 ; *Preiser* v. *Weilandt*, 48 App. Div. 569 ; *Moore* v. *Rugg*, 44 Minn. 28.)

PARKER, Ch. J. The Appellate Division has certified that the following questions of law have arisen in this case, and

ought to be reviewed by this court: 1. Does the complaint herein state a cause of action at law against the defendants or either of them? 2. Does the complaint herein state a cause of action in equity against the defendants or either of them? These questions are presented by a demurrer to the complaint, which is put upon the ground that the complaint does not state facts sufficient to constitute a cause of action.

As a demurrer admits not only those facts which are expressly alleged in the complaint, but everything which can be implied by fair and reasonable intendment from its allegations (*Marie* v. *Garrison*, 83 N. Y. 14, 23) we are to inquire whether the complaint, regarded from the standpoint of this rule, can be said to show any right to relief either in law or in equity.

The complaint alleges that the Franklin Mills Co., one of the defendants, was engaged in a general milling business and in the manufacture and sale of flour; that before the commencement of the action, without the knowledge or consent of plaintiff, defendants, knowing that they had no right or authority so to do, had obtained, made, printed, sold and circulated about 25,000 lithographic prints, photographs and likenesses of plaintiff, made in a manner particularly set up in the complaint; that upon the paper upon which the likenesses were printed and above the portrait there were printed, in large, plain letters, the words, "Flour of the Family," and below the portrait in large capital letters, "Franklin Mills Flour," and in the lower right-hand corner in smaller capital letters, "Rochester Folding Box Co., Rochester, N. Y.;" that upon the same sheet were other advertisements of the flour of the Franklin Mills Co.; that those 25,000 likenesses of the plaintiff thus ornamented have been conspicuously posted and displayed in stores, warehouses, saloons and other public places; that they have been recognized by friends of the plaintiff and other people with the result that plaintiff has been greatly humiliated by the scoffs and jeers of persons who have recognized her face and picture on this advertisement and her good name has been attacked, causing her

great distress and suffering both in body and mind; that she was made sick and suffered a severe nervous shock, was confined to her bed and compelled to employ a physician, because of these facts; that defendants had continued to print, make, use, sell and circulate the said lithographs, and that by reason of the foregoing facts plaintiff had suffered damages in the sum of $15,000. The complaint prays that defendants be enjoined from making, printing, publishing, circulating or using in any manner any likenesses of plaintiff in any form whatever, for further relief (which it is not necessary to consider here) and for damages.

It will be observed that there is no complaint made that plaintiff was libeled by this publication of her portrait. The likeness is said to be a very good one, and one that her friends and acquaintances were able to recognize; indeed, her grievance is that a good portrait of her, and, therefore, one easily recognized, has been used to attract attention toward the paper upon which defendant mill company's advertisements appear. Such publicity, which some find agreeable, is to plaintiff very distasteful, and thus, because of defendants' impertinence in using her picture without her consent for their own business purposes, she has been caused to suffer mental distress where others would have appreciated the compliment to their beauty implied in the selection of the picture for such purposes; but as it is distasteful to her, she seeks the aid of the courts to enjoin a further circulation of the lithographic prints containing her portrait made as alleged in the complaint, and as an incident thereto, to reimburse her for the damages to her feelings, which the complaint fixes at the sum of $15,000.

There is no precedent for such an action to be found in the decisions of this court; indeed the learned judge who wrote the very able and interesting opinion in the Appellate Division said, while upon the threshold of the discussion of the question: "It may be said in the first place that the theory upon which this action is predicated is new, at least in instance if not in principle, and that few precedents can be found to sustain the claim made by the plaintiff, if indeed it can be said

that there are any authoritative cases establishing her right to recover in this action." Nevertheless, that court reached the conclusion that plaintiff had a good cause of action against defendants, in that defendants had invaded what is called a "right of privacy" — in other words, the right to be let alone. Mention of such a right is not to be found in Blackstone, Kent or any other of the great commentators upon the law, nor so far as the learning of counsel or the courts in this case have been able to discover, does its existence seem to have been asserted prior to about the year 1890, when it was presented with attractiveness and no inconsiderable ability in the Harvard Law Review (Vol. IV, page 193) in an article entitled, "The Right of Privacy."

The so-called right of privacy is, as the phrase suggests, founded upon the claim that a man has the right to pass through this world, if he wills, without having his picture published, his business enterprises discussed, his successful experiments written up for the benefit of others, or his eccentricities commented upon either in handbills, circulars, catalogues, periodicals or newspapers, and, necessarily, that the things which may not be written and published of him must not be spoken of him by his neighbors, whether the comment be favorable or otherwise. While most persons would much prefer to have a good likeness of themselves appear in a responsible periodical or leading newspaper rather than upon an advertising card or sheet, the doctrine which the courts are asked to create for this case would apply as well to the one publication as to the other, for the principle which a court of equity is asked to assert in support of a recovery in this action is that the right of privacy exists and is enforceable in equity, and that the publication of that which purports to be a portrait of another person, even if obtained upon the street by an impertinent individual with a camera, will be restrained in equity on the ground that an individual has the right to prevent his features from becoming known to those outside of his circle of friends and acquaintances.

If such a principle be incorporated into the body of the

law through the instrumentality of a court of equity, the attempts to logically apply the principle will necessarily result, not only in a vast amount of litigation, but in litigation bordering upon the absurd, for the right of privacy, once established as a legal doctrine, cannot be confined to the restraint of the publication of a likeness but must necessarily embrace as well the publication of a word-picture, a comment upon one's looks, conduct, domestic relations or habits. And were the right of privacy once legally asserted it would necessarily be held to include the same things if spoken instead of printed, for one, as well as the other, invades the right to be absolutely let alone. An insult would certainly be in violation of such a right and with many persons would more seriously wound the feelings than would the publication of their picture. And so we might add to the list of things that are spoken and done day by day which seriously offend the sensibilities of good people to which the principle which the plaintiff seeks to have imbedded in the doctrine of the law would seem to apply. I have gone only far enough to barely suggest the vast field of litigation which would necessarily be opened up should this court hold that privacy exists as a legal right enforceable in equity by injunction, and by damages where they seem necessary to give complete relief.

The legislative body could very well interfere and arbitrarily provide that no one should be permitted for his own selfish purpose to use the picture or the name of another for advertising purposes without his consent. In such event no embarrassment would result to the general body of the law, for the rule would be applicable only to cases provided for by the statute. The courts, however, being without authority to legislate, are required to decide cases upon principle, and so are necessarily embarrassed by precedents created by an extreme, and, therefore, unjustifiable application of an old principle.

The court below properly said that " while it may be true that the fact that no precedent can be found to sustain an action in any given case, is cogent evidence that a principle

35

does not exist upon which the right may be based, it is not the rule that the want of a precedent is a sufficient reason for turning the plaintiff out of court," provided — I think should be added — there can be found a clear and unequivocal principle of the common law which either directly or mediately governs it or which by analogy or parity of reasoning ought to govern it.

It is undoubtedly true that in the early days of chancery jurisdiction in England the chancellors were accustomed to deliver their judgments without regard to principles or precedents and in that way the process of building up the system of equity went on, the chancellor disregarding absolutely many established principles of the common law. "In no other way," says Pomeroy, "could the system of equity jurisprudence have been commenced and continued so as to arrive at its present proportions." (Pomeroy's Eq. Jur. § 48.) In their work the chancellors were guided not only by what they regarded as the eternal principles of absolute right, but also by their individual consciences, but after a time when "the period of infancy was passed and an orderly system of equitable principles, doctrines and rules began to be developed out of the increasing mass of precedents, this theory of a personal conscience was abandoned; and 'the conscience,' which is an element of the equitable jurisdiction, came to be regarded, and has so continued to the present day, as a metaphorical term, designating the common standard of civil right and expediency combined, based upon general principles and limited by established doctrines to which the court appeals, and by which it tests the conduct and rights of suitors — a juridical and not a personal conscience." (Pomeroy's Eq. Jur. § 57.)

The importance of observing the spirit of this rule cannot be overestimated, for, while justice in a given case may be worked out by a decision of the court according to the notions of right which govern the individual judge or body of judges comprising the court, the mischief which will finally result may be almost incalculable under our system which makes a

decision in one case a precedent for decisions in all future cases which are akin to it in the essential facts.

So in a case like the one before us, which is concededly new to this court, it is important that the court should have in mind the effect upon future litigation and upon the development of the law which would necessarily result from a step so far outside of the beaten paths of both common law and equity, assuming — what I shall attempt to show in a moment — that the right of privacy as a legal doctrine enforceable in equity has not, down to this time, been established by decisions.

The history of the phrase " right of privacy " in this country seems to have begun in 1890 in a clever article in the Harvard Law Review — already referred to — in which a number of English cases were analyzed, and, reasoning by analogy, the conclusion was reached that — notwithstanding the unanimity of the courts in resting their decisions upon property rights in cases where publication is prevented by injunction — in reality such prevention was due to the necessity of affording protection to thoughts and sentiments expressed through the medium of writing, printing and the arts, which is like the right not to be assaulted or beaten ; in other words, that the principle, actually involved though not always appreciated, was that of an inviolate personality, not that of private property.

This article brought forth a reply from the Northwestern Review (Vol. III, page 1) urging that equity has no concern with the feelings of an individual or with considerations of moral fitness, except as the inconvenience or discomfort which the person may suffer is connected with the possession or enjoyment of property, and that the English authorities cited are consistent with such view. Those authorities are now to be examined in order that we may see whether they were intended to and did mark a departure from the established rule which had been enforced for generations ; or, on the other hand, are entirely consistent with it.

The first case is *Prince Albert* v. *Strange* (1 Macn. & G.

25 ; 2 De G. & S. 652). The queen and the prince, having made etchings and drawings for their own amusement, decided to have copies struck off from the etched plates for presentation to friends and for their own use. The workman employed, however, printed some copies on his own account, which afterwards came into the hands of Strange, who purposed exhibiting them, and published a descriptive catalogue. Prince Albert applied for an injunction as to both exhibition and catalogue, and the vice-chancellor granted it, restraining defendant from publishing "at least by printing or writing, *though not by copy or resemblance*," a description of the etchings. An examination of the opinion of the vice-chancellor discloses that he found two reasons for granting the injunction, namely, that the property rights of Prince Albert had been infringed, and that there was a breach of trust by the workman in retaining some impressions for himself. The opinion contained no hint whatever of a right of privacy separate and distinct from the right of property.

*Pollard* v. *Photographic Co.* (L. R. 40 Ch. Div. 345) is certainly not an authority for granting an injunction on the ground of threatened injury to the feelings, although it is true, as stated in the opinion of the Appellate Division, that the court did say in the course of the discussion that the right to grant an injunction does not depend upon the existence of property ; but the decision was, in fact, placed upon the ground that there was a breach of an implied contract. The facts, briefly stated, were that a photographer had been applied to by a woman to take her photograph, she ordering a certain number of copies, as is usual in such cases. The photographer made copies for himself and undertook to exhibit them, and also sold copies to a stationer, who used them as Christmas cards. Their action was restrained by the court on the ground that there was an implied contract not to use the negative for any other purpose than to supply the sitter with copies of it for a price. During the argument of plaintiff's counsel, the court asked this question : "Do you dispute that if the negative likeness were taken on the sly, the person who took it

might exhibit copies?".  Counsel replied : "In that case there would be no consideration to support a contract."

In *Gee* v. *Pritchard* (2 Swanst. 402) B attempted to print a private letter written him by A, and he was restrained on the ground that the property of that private letter remained in A, B having it only for the qualified purpose for which it was sent to him, the basis of the decision, therefore, being the idea of plaintiff's property in the thing published, as being the product of his mind, written by him and put into the hands of B for a limited purpose only.

The same judge, Lord Eldon, also granted the injunction in *Abernathy* v. *Hutchinson* (3 L. J. Ch. 209) restraining the publication in the "Lancet" of lectures delivered at a hospital by the plaintiff.  The court expressed a doubt in that case whether there could be property in lectures which had not been reduced to writing, but granted the injunction on the ground that it was a breach of confidence on the part of a pupil who was admitted to hear the lectures to publish them, inasmuch as they were delivered for the information of the pupils and not for sale and profit by them.

*Mayhall* v. *Higbey* (1 H. & C. 188) was also a case where an injunction was granted and nominal damages awarded on the ground that plaintiff had a property right in certain photographic negatives which he had loaned to a person who, subsequently, became insolvent and whose assignee, without right, sold them to defendant who printed copies from them which he published and sold.

In *Duke of Queensberry* v. *Shebbeare* (2 Eden, 329) the Earl of Clarendon delivered to one Gwynne an original manuscript of his father's, "Lord Clarendon's History."  Gwynne's administrator afterwards sold it to Shebbeare, and the court, upon the application of the personal representatives of Lord Clarendon, restrained its publication on the ground that they had a property right in the manuscript which it was not intended that Gwynne should have the benefit of by multiplying the number of copies in print for profit.

In not one of these cases, therefore, was it the basis of the

decision that the defendant could be restrained from perform-
ing the act he was doing or threatening to do on the ground
that the feelings of the plaintiff would be thereby injured;
but, on the contrary, each decision was rested either upon the
ground of breach of trust or that plaintiff had a property
right in the subject of litigation which the court could
protect.

A more recent English case, decided in 1898, is more nearly
in point and negatives the contention that plaintiff may
restrain an unauthorized publication which is offensive to him
— namely, *Dockrell* v. *Dougall* (78 L. T. R. 840). In that
case defendant, the owner of a medicine called " Sallyco,"
published the following substantially true but unauthorized
statement about plaintiff: "Dr. Morgan Dockrell, physician
to St. John's Hospital, London, is prescribing Sallyco as an
habitual drink. Dr. Dockrell says nothing has done his gout
so much good." In the course of the opinion the court said,
in effect, that plaintiff claimed to be entitled to an injunction
restraining defendant from using plaintiff's name in his adver-
tisements on the ground that an injunction should be granted
in every such case where it can be shown that the use of the
plaintiff's name is unauthorized and is calculated to injure
him in his profession, and after saying that he did not think
that this was right, he stated the proper rule to be that "In
order that an injunction may issue to restrain a defendant
from using a plaintiff's name the use of it must be such as to
injure the plaintiff's reputation or property."

None of the other English cases brought to our attention
are claimed to have a direct bearing upon this question, and it
seems to us very clear that they do not in anywise support
the position of plaintiff.

The case that seems to have been more relied upon than
any other by the learned Appellate Division in reaching the
conclusion that the complaint in this case states a cause of
action, is *Schuyler* v. *Curtis* (147 N. Y. 434). In that case
certain persons attempted to erect a statue or bust of a woman
no longer living, and one of her relatives commenced an action

in equity to restrain such erection, alleging that his feelings and the feelings of other relatives of deceased would be injured thereby.  At Special Term an injunction was granted on that ground.  (19 N. Y. Supp. 264.)  The General Term affirmed the decision.  (64 Hun, 594.)  This court reversed the judgment, Judge PECKHAM writing, and so far as the decision is concerned, therefore, it is not authority for the existence of a right of privacy which entitles a party to restrain another from doing an act which, though not actionable at common law, occasions plaintiff mental distress.   In the course of the argument, however, expressions were used which it is now claimed indicate that the court recognized the existence of such a right.   A sufficient answer to that contention is to be found in the opinion written on the motion for reargument in *Colonial City Tr. Co.* v. *Kingston City R. R. Co.* (154 N. Y. 493) in which it was said : " It was not our intention to decide any case but the one before us.   \*   \*   \*   If, as sometimes happens, broader statements were made by way of argument or otherwise than were essential to the decision of the questions presented, they are the dicta of the writer of the opinion and not the decision of the court.   A judicial opinion, like evidence, is only binding so far as it is relevant, and when it wanders from the point at issue it no longer has force as an official utterance."   The question up for decision in the *Schuyler* case was whether the relatives could restrain the threatened action of defendants, and not whether Mrs. Schuyler could have restrained it had she been living.   The latter question not being before the court it was not called upon to decide it, and, as we read the opinion, there is no expression in it which indicates an intention either to decide it or to seriously consider it, but rather, it proceeds upon the assumption that if such a right did exist in Mrs. Schuyler, her relatives did not succeed to it upon her death; all of which will sufficiently appear from the following extracts from the opinion :

" This action is of a nature somewhat unusual and dependent for its support upon the application of certain principles which are themselves not very clearly defined or their bound-

aries very well recognized or plainly laid down. Briefly described, the action is founded upon the alleged violation of *what is termed the right of privacy.*"

" It is not necessary, however, to the view which we take of this case, to lay down precise and accurate rules which shall apply to all cases touching upon this *alleged right.*"

" *For the purposes we have in view, it is unnecessary to wholly deny the existence of the right of privacy* to which the plaintiff appeals as the foundation of his cause of action."

" *While not assuming to decide what this right of privacy is in all cases,* we are quite clear that such a right would not be violated by the proposed action of the defendants."

There are two other cases in this state bearing upon this question: *Marks* v. *Jaffa* (26 N. Y. Supp. 908), decided at Special Term, and *Murray* v. *Gast Lithographic & Engraving Co.* (8 Misc. Rep. 36) decided at an Equity Term of the Court of Common Pleas at New York. In the first case the relief prayed for was granted upon the authority of the decision of the General Term in the *Schuyler* case, which was subsequently reversed in this court. In the *Murray* case, in a well-reasoned opinion by Judge Bischoff, it is held that a parent cannot maintain an action to enjoin an unauthorized publication of the portrait of an infant child, and for damages for injuries to his sensibilities caused by the invasion of his child's privacy, because " the law takes no cognizance of a sentimental injury, independent of a wrong to person or property." In the course of his opinion he quotes from the opinion of Lumpkin, J., in *Chapman* v. *West. U. T. Co.* (88 Ga. 763) as follows: " The law protects the person and the purse. The person includes the reputation. The body, reputation and property of the citizen are not to be invaded without responsibility in damages to the sufferer. But, outside these protected spheres, the law does not yet attempt to guard the peace of mind, the feelings or the happiness of everyone by giving recovery of damages for mental anguish produced by mere negligence. There is no right, capable of enforcement by process of law, to possess or maintain, without disturb-

ance, any particular condition of feeling. The law leaves feeling to be helped and vindicated by the tremendous force of sympathy. The temperaments of individuals are various and variable, and the imagination exerts a powerful and incalculable influence in injuries of this kind. There are many moral obligations too delicate and subtle to be enforced in the rude way of giving money compensation for their violation. Perhaps the feelings find as full protection as it is possible to give in moral law and a responsive public opinion. The civil law is a practical business system, dealing with what is tangible, and does not undertake to redress psychological injuries."

Outside of this jurisdiction the question seems to have been presented in two other cases in this country : *Corliss* v. *E. W. Walker Co.* (57 Fed. Rep. 434 ; 64 Fed. Rep. 280) and *Atkinson* v. *Doherty* (121 Mich. 372). The *Corliss* case was an action in equity to restrain the publication of the biography and picture of Mr. Corliss. It was based upon an alleged invasion of the right of privacy. The court denied the injunction as to the publication of the biography but granted it as to the use of certain plates from which the defendant was to make a picture of Mr. Corliss, upon the ground that they had been obtained upon conditions which defendant had not complied with. In the course of the opinion the court said : "Under our laws one can speak and publish what he desires, provided he commit no offense against public morals or private reputation. * * * There is another objection which meets us at the threshold of this case. The subject-matter of the jurisdiction of a court of equity is civil property, and injury to property, whether actual or prospective is the foundation on which its jurisdiction rests. (*Re Sawyer*, 124 U. S. 200, 210 ; Kerr. Inj. [2d ed.] p. 1.) It follows from this principle that a court of equity has no power to restrain a libelous publication." Both the opinion and the decision necessarily negative the existence of an actionable right of privacy ; but subsequently upon a motion to dissolve the injunction, which was granted upon the ground that Mr. Corliss was a

public character, and hence the publishers were entitled to use his picture, the learned court expressed the opinion that a private individual has the right to be protected from the publication of his portrait in any form. Now, while this suggestion was *obiter*, it merits discussion, and an examination of that which it promulgates as doctrine discloses what we deem a fatal objection to the establishment of a rule of privacy. The learned judge says: " I believe the law to be that a private individual has a right to be protected in the representation of his portrait in any form; that this is a property as well as a personal right, and that it belongs to the same class of rights which forbids the reproduction of a private manuscript or painting, or the publication of private letters, or of oral lectures delivered by a teacher to his class, or the revelation of the contents of a merchant's book by a clerk. * * * But, while the right of a private individual to prohibit the reproduction of his picture or photograph should be recognized and enforced, this right may be surrendered or dedicated to the public by the act of the individual, just the same as a private manuscript, book or painting becomes (when not protected by copyright) public property by the act of publication. The distinction in the case of a picture or photograph lies, it seems to me, between public and private characters. A private individual should be protected against the publication of any portrait of himself, but where an individual becomes a public character the case is different. A statesman, author, artist or inventor, who asks for and desires public recognition, may be said to have surrendered his right to the public." This distinction between public and private characters cannot possibly be drawn. On what principle does an author or artist forfeit his right of privacy and a great orator, a great preacher, or a great advocate retain his? Who can draw a line of demarcation between public characters and private characters, let that line be as wavering and irregular as you please? In the very case then before the judge, what had Mr. Corliss done by which he surrendered his right of privacy? In what respect did he

by his inventions " ask for and desire public recognition " any more than a banker or merchant who prosecutes his calling ? Or is the right of privacy the possession of mediocrity alone, which a person forfeits by giving rein to his ability, spurs to his industry or grandeur to his character ? A lady may pass her life in domestic privacy when, by some act of heroism or self-sacrifice, her name and fame fill the public ear. Is she to forfeit by her good deed the right of privacy she previously possessed ? These considerations suggest the answer we would make to the position of the learned judge and at the same time serve to make more clear what we have elsewhere attempted to point out, namely, the absolute impossibility of dealing with this subject save by legislative enactment, by which may be drawn arbitrary distinctions which no court should promulgate as a part of general jurisprudence.

*Atkinson* v. *Doherty* was a suit in equity brought by the widow of Colonel John Atkinson, a well-known lawyer in Detroit, to enjoin the defendant, a cigar manufacturer, from using the name and portrait of Colonel Atkinson upon boxes of cigars manufactured by defendant. The suit was dismissed by the Circuit Court, and its decree was unanimously affirmed by the Supreme Court. The case quite closely resembles the *Schuyler* case, which was brought to the attention of that court, and in the course of the opinion the contention that the *Schuyler* case intimated the existence of a right of privacy was met as follows : " We think it should not be considered as containing a *dictum* even in support of the doctrine contended for." The method adopted by the court in the *Atkinson* case in treating the question was different from that employed by this court in the *Schuyler* case, however, for the opinion proceeds to a review of the authorities upon which the right of privacy is said to rest, reaching the conclusion that all of the authorities which are entitled to respect are based upon property or contract rights, and hence " that Colonel Atkinson would himself be remediless were he alive, and the same is true of his friends who survive." The opinion concludes as follows : " This law of privacy seems to

have gained a foothold at one time in the history of our jurisprudence — not by that name, it is true — but in effect. It is evidenced by the old maxim, ' the greater the truth the greater the libel,' and the result has been the emphatic expression of public disapproval, by the emancipation of the press and the establishment of freedom of speech, and the abolition in most of the states of the maxim quoted by constitutional provisions. The limitations upon the exercise of these rights being the law of slander and libel, whereby the publication of an untruth that can be presumed or shown to the satisfaction, not of the plaintiff, but of others (i. e., an impartial jury), to be injurious, not alone to the feelings, but to the reputation, is actionable. Should it be thought that it is a hard rule that is applied in this case, it is only necessary to call attention to the fact that a ready remedy is to be found in legislation. We are not satisfied, however, that the rule is a hard one, and think that the concensus of opinion must be that the complainants contend for a much harder one. The law does not remedy all evils. It cannot, in the nature of things; and deliberation may well be used in considering the propriety of an innovation such as this case suggests. We do not wish to be understood as belittling the complaint. We have no reason to doubt the feeling of annoyance alleged. Indeed, we sympathize with it, and marvel at the impertinence which does not respect it. We can only say that it is one of the ills that under the law cannot be redressed."

An examination of the authorities leads us to the conclusion that the so-called "right of privacy" has not as yet found an abiding place in our jurisprudence, and, as we view it, the doctrine cannot now be incorporated without doing violence to settled principles of law by which the profession and the public have long been guided.

I do not say that, even under the existing law, in every case of the character of the one before us, or indeed in this case, a party whose likeness is circulated against his will is without remedy. By section 245 of the Penal Code any malicious publication by picture, effigy or sign which exposes

a person to contempt, ridicule or obloquy is a libel, and it would constitute such at common law. Malicious in this definition means simply intentional and willful. There are many articles, especially of medicine, whose character is such that using the picture of a person, particularly that of a woman, in connection with the advertisement of those articles might justly be found by a jury to cast ridicule or obloquy on the person whose picture was thus published. The manner or posture in which the person is portrayed might readily have a like effect. In such cases both a civil action and a criminal prosecution could be maintained. But there is no allegation in the complaint before us that this was the tendency of the publication complained of, and the absence of such an allegation is fatal to the maintenance of the action, treating it as one of libel. This case differs from an action brought for libelous words. In such case the alleged libel is stated in the complaint, and if the words are libelous *per se* it is unnecessary to charge that their effect exposes the plaintiff to disgrace, ridicule or obloquy. The law attributes to them that result. But where the libel is a picture which does not appear in the record, to make it libelous there must be a proper allegation as to its character.

The judgment of the Appellate Division and of the Special Term should be reversed and questions certified answered in the negative, without costs, and with leave to the plaintiff to serve an amended complaint within twenty days, also without costs.

Gray, J. (dissenting). The question arises on the defendants' demurrer to the sufficiency of the complaint to state a cause of action. The complaint alleges that, without the knowledge of the plaintiff, the defendants, "knowing that they had no right or authority so to do, had obtained, made, printed, sold and circulated about 25,000 lithographic prints, photographs or likenesses of plaintiff, for the purpose of profit and gain to themselves;" that upon the paper upon which

the likeness was printed, are the words above the portrait, in large, plain letters, "Flour of the Family," and below, in large capital letters, "Franklin Mills Flour," and in the lower right-hand corner, in small capital letters, are the words "Rochester Folding Box Company;" that upon the same paper are the advertisements of the flour of the Franklin Mills Company; that these 25,000 likenesses of the plaintiff thus ornamented have been "conspicuously posted and displayed in stores, warehouses and saloons, throughout the United States and other countries, and particularly in the vicinity where the plaintiff resides;" that the result has been to greatly humiliate her, by the scoffs and jeers of persons who have recognized her face upon these advertisements, and her good name has been attacked and that, because of these facts, "she was made sick and suffered a severe nervous shock, was confined to her bed and was compelled to employ a physician." The plaintiff, further, alleges that the defendants "are now wrongfully printing, making, using, selling and circulating these lithographs," and that, by reason of these facts, she has suffered damages in the sum of $15,000. The relief demanded is that the defendants be enjoined from making, printing, publishing, obtaining, or using, in any manner, any likeness of the plaintiff in any form whatever. The facts contained within these allegations must be regarded as admitted, under the defendant's demurrer; as must all other facts which can be implied, by reasonable and fair intendment. (*Marie* v. *Garrison*, 83 N. Y. 14.) These defendants stand before the court, admitting that they have made, published and circulated, without the knowledge or the authority of the plaintiff, 25,000 lithographic portraits of her, for the purpose of profit and gain to themselves; that these portraits have been conspicuously posted in stores, warehouses and saloons, in the vicinity of the plaintiff's residence and throughout the United States, as advertisements of their goods; that the effect has been to humiliate her and to render her ill and, yet, claiming that she makes out no cause of action. They say

that no law on the statute books gives her a right of action
and that her right to privacy is not an actionable right, at law
or in equity.

Our consideration of the question thus presented has not
been foreclosed by the decision in *Schuyler* v. *Curtis*, (147 N.
Y.. 434). In that case, it appeared that the defendants were
intending to make, and to exhibit, at the Columbian Exposi-
tion of 1893, a statue of Mrs. Schuyler, formerly Miss Mary
M. Hamilton and conspicuous in her lifetime for her philan-
thropic work, to typify "Woman as the Philanthropist" and,
as a companion piece, a statue of Miss Susan B. Anthony, to
typify the "Representative Reformer." The plaintiff, in
behalf of himself, as the nephew of Mrs. Schuyler, and of
other immediate relatives, sought by the action to restrain
them from carrying out their intentions as to the statue of
Mrs. Schuyler; upon the grounds, in substance, that they
were proceeding without his consent, (whose relationship was
conceded to be such as to warrant such an action, if it were
maintainable at all), or that of the other immediate members
of the family; that their proceeding was disagreeable to him,
because it would have been disagreeable and obnoxious to his
aunt, if living, and that it was annoying to have Mrs. Schuy-
ler's memory associated with principles, which Miss Susan B.
Anthony typified and of which Mrs. Schuyler did not approve.
His right to maintain the action was denied and the denial was
expressly placed upon the ground that he, as a relative, did
not represent any right of privacy which Mrs. Schuyler
possessed in her lifetime and that, whatever her right had
been, in that respect, it died with her. The existence of
the individual's right to be protected against the invasion of
his privacy, if not actually affirmed in the opinion, was, very
certainly, far from being denied. "It may be admitted,"
Judge PECKHAM observed, when delivering the opinion of the
court, "that courts have power, in some cases, to enjoin the
doing of an act, where the nature, or character, of the act
itself is well calculated to wound the sensibilities of an indi-

vidual, and where the doing of the act is wholly unjustifiable, and is, in legal contemplation, a wrong, *even though the existence of no property*, as that term is usually used, *is involved in the subject.*"

That the individual has a right to privacy, which he can enforce and which equity will protect against the invasion of, is a proposition which is not opposed by any decision in this court and which, in my opinion, is within the field of accepted legal principles.     It is within the very case supposed by Judge PECKHAM in *Schuyler* v. *Curtis*.     In the present case, we may not say that the plaintiff's complaint is fanciful, or that her alleged injury is, purely, a sentimental one.     Her objection to the defendants' acts is not one born of caprice; nor is it based upon the defendants' act being merely " distasteful " to her. We are bound to assume, and I find no difficulty in doing so, that the conspicuous display of her likeness, in various public places, has so humiliated her by the notoriety and by the public comments it has provoked, as to cause her distress and suffering, in body and in mind, and to confine her to her bed with illness.

If it were necessary, to be entitled to equitable relief, that the plaintiff's sufferings, by reason of the defendants' acts, should be serious, and appreciable by a pecuniary standard, clearly, we might well say, under the allegations of the complaint, that they were of such degree of gravity.     However, I am not of the opinion that the gravity of the injury need be such as to be capable of being estimated by such a standard. If the right of privacy exists and this complaint makes out a case of its substantial violation, I think that the award of equitable relief, by way of an injunction, preventing the continuance of its invasion by the defendants, will not depend upon the complainant's ability to prove substantial pecuniary damages and, if the court finds the defendants' act to be without justification and for selfish gain and purposes, and to be of such a character, as is reasonably calculated to wound the feelings and to subject the plaintiff to the ridicule, or to the

contempt of others, that her right to the preventive relief of equity will follow; without considering how far her sufferings may be measurable by a pecuniary standard.

The right of privacy, or the right of the individual to be let alone, is a personal right, which is not without judicial recognition. It is the complement of the right to the immunity of one's person. The individual has always been entitled to be protected in the exclusive use and enjoyment of that which is his own. The common law regarded his person and property as inviolate, and he has the absolute right to be let alone. (Cooley on Torts, p. 29.) The principle is fundamental and essential in organized society that every one, in exercising a personal right and in the use of his property, shall respect the rights and properties of others. He must so conduct himself, in the enjoyment of the rights and privileges which belong to him as a member of society, as that he shall prejudice no one in the possession and enjoyment of those which are exclusively his. When, as here, there is an alleged invasion of some personal right, or privilege, the absence of exact precedent and the fact that early commentators upon the common law have no discussion upon the subject are of no material importance in awarding equitable relief. That the exercise of the preventive power of a court of equity is demanded in a novel case, is not a fatal objection. (*Niagara Falls Int. Bridge Co.* v. *Great Western Ry. Co.*, 39 Barb. 212; *Sherman* v. *Skuse*, 166 N. Y. 352; *Hamilton* v. *Whitridge*, 11 Md. 145.) In the social evolution, with the march of the arts and sciences and in the resultant effects upon organized society, it is quite intelligible that new conditions must arise in personal relations, which the rules of the common law, cast in the rigid mould of an earlier social status, were not designed to meet. It would be a reproach to equitable jurisprudence, if equity were powerless to extend the application of the principles of common law, or of natural justice, in remedying a wrong, which, in the progress of civilization, has been made possible as the result of new social, or commercial con-

36

ditions. Sir Henry Maine, in his work on Ancient Law, has observed of equity, that it is an agency "by which law is brought into harmony with society," and that it is one of the factors, which operate in judicial evolution. It succeeds legal fictions, or those judicial assumptions, through which a rule of law is modified in its operation, and it precedes legislation. (See Maine's Ancient Law, pp. 22 to 28.) Equity has neither fixed boundaries, nor logical subdivisions and its origin, both in Rome and in England, was that there was a wrong for which there was no remedy at law. (See 1st Story Eq. Juris. secs. 49 and 50.) It supplements the deficiencies of the common law, by applying, where otherwise there would result a wrong, those principles of natural justice, which are analogous to settled principles of the common law. (See Story's Eq. Jur. sec. 671, note.) Lord Chancellor COTTENHAM observed, in *Wallworth* v. *Holt*, (4 Myl. & C. 619), "I think it is the duty of this court, (meaning equity), to adopt its practice and course of proceeding to the existing state of society and not, by a strict adherence to forms and rules, under different circumstances, to decline to administer justice and enforce rights for which there is no other remedy. * * * If it were necessary to go much further than it is, in opposition to some sanctioned opinions, in order to open the doors of this court to those who could not obtain it elsewhere, I should not shrink from the responsibility of doing so." As I have suggested, that the exercise of this peculiar preventive power of a court of equity is not found in some precisely analogous case, furnishes no valid objection, at all, to the assumption of jurisdiction, if the particular circumstances of the case show the performance, or the threatened performance, of an act by a defendant, which is wrongful, because constituting an invasion, in some novel form, of a right to something, which is, or should be conceded to be, the plaintiff's and as to which the law provides no adequate remedy. It would be a justifiable exercise of power, whether the principle of interference be rested upon analogy to some

established common-law principle, or whether it is one of natural justice. In an article in the Harvard Law Review, of December 15th, 1890, which contains an impressive argument upon the subject of the "right of privacy," it was well said by the authors " that the individual shall have full protection in person and in property is a principle as old as the common law; but it has been found necessary from time to time to define anew the exact nature and extent of such protection. * * * The right to life has come to mean the right to enjoy life—the right to be let alone; the right to liberty secures the exercise of extensive civil privileges; and the term 'property' has grown to comprise every form of possession—intangible, as well as tangible."

Instantaneous photography is a modern invention and affords the means of securing a portraiture of an individual's face and form, *in invitum* their owner. While, so far forth as it merely does that, although a species of aggression, I concede it to be an irremediable and irrepressible feature of the social evolution. But, if it is to be permitted that the portraiture may be put to commercial, or other, uses for gain, by the publication of prints therefrom, then an act of invasion of the individual's privacy results, possibly more formidable and more painful in its consequences, than an actual bodily assault might be. Security of person is as necessary as the security of property; and for that complete personal security, which will result in the peaceful and wholesome enjoyment of one's privileges as a member of society, there should be afforded protection, not only against the scandalous portraiture and display of one's features and person, but against the display and use thereof for another's commercial purposes or gain. The proposition is, to me, an inconceivable one that these defendants may, unauthorizedly, use the likeness of this young woman upon their advertisement, as a method of attracting widespread public attention to their wares, and that she must submit to the mortifying notoriety, without right to invoke the exercise of the preventive power of a court of equity.

Such a view, as it seems to me, must have been unduly influenced by a failure to find precedents in analogous cases, or some declaration by the great commentators upon the law of a common-law principle which would, precisely, apply to and govern the action; without taking into consideration that, in the existing state of society, new conditions affecting the relations of persons demand the broader extension of those legal principles, which underlie the immunity of one's person from attack. I think that such a view is unduly restricted, too, by a search for some property, which has been invaded by the defendants' acts. Property is not, necessarily, the thing itself, which is owned; it is the right of the owner in relation to it. The right to be protected in one's possession of a thing, or in one's privileges, belonging to him as an individual, or secured to him as a member of the commonwealth, is property, and as such entitled to the protection of the law. The protective power of equity is not exercised upon the tangible thing, but upon the right to enjoy it; and, so, it is called forth for the protection of the right to that which is one's exclusive possession, as a property right. It seems to me that the principle, which is applicable, is analogous to that upon which courts of equity have interfered to protect the right of privacy, in cases of private writings, or of other unpublished products of the mind. The writer, or the lecturer, has been protected in his right to a literary property in a letter, or a lecture, against its unauthorized publication; because it is property, to which the right of privacy attaches. (*Woolsey* v. *Judd*, 4 Duer, 399; *Gee* v. *Pritchard*, 2 Swanst. 402; *Abernathy* v. *Hutchinson*, 3 L. J. Ch. 209; *Folsom* v. *Marsh*, 2 Story, 100.) I think that this plaintiff has the same property in the right to be protected against the use of her face for defendant's commercial purposes, as she would have, if they were publishing her literary compositions. The right would be conceded, if she had sat for her photograph; but if her face, or her portraiture, has a value, the value is hers exclusively; until the use be granted away to the public.

Any other principle of decision, in my opinion, is as repugnant to equity; as it is shocking to reason. Judge Colt, of the United States Court, in *Corliss* v. *Walker Co.*, (64 Fed. Rep. 280–5), a case involving the same question of an invasion of the right of privacy, with respect to the publication of a printed likeness of Mr. Corliss, expressed the opinion that "independently of the question of contract, I believe the law to be that a private individual has a right to be protected in the representation of his portrait in any form; that this is a property as well as a personal right, and that it belongs to the same class of rights which forbids the reproduction of a private manuscript or painting, or the publication of private letters, or of oral lectures delivered by a teacher to his class, or the revelation of the contents of a merchant's books by a clerk." The case itself is not in point in its facts; because the complainant was the widow of Mr. Corliss and thus it came within the limitations of *Schuyler* v. *Curtis*.

The right to grant the injunction does not depend upon the existence of property, which one has in some contractual form. It depends upon the existence of property in any right which belongs to a person. In *Pollard* v. *Photographic Co.*, (40 Ch. Div. 345), it was held that the right to grant an injunction against selling copies of plaintiff's photographs did not depend upon the existence of property and that "it is quite clear that independently of any question as to the right at law, the Court of Chancery always had an original and independent jurisdiction to prevent what that court considered and treated as a wrong, whether arising from a violation of an unquestionable right, or from breach of confidence, or contract, as was pointed out by Lord Cottenham in *Prince Albert* v. *Strange*, (1 Macn. & G. 25)." In *Prince Albert* v. *Strange*, Lord Chancellor Cottenham sustained the issuance of an injunction, upon the ground that the right of privacy had been invaded by the publication and sale of etchings, made by Prince Albert and Queen Victoria. Upon the origi-

nal hearing, Vice-Chancellor Knight-Bruce, in granting the injunction, observed that, " upon the principle of protecting property, it is that the common law, in cases not aided or prejudiced by statute, shelters the privacy and seclusion of thoughts and sentiments committed to writing, and desired by the author to remain not generally known."

It would be, in my opinion, an extraordinary view which, while conceding the right of a person to be protected against the unauthorized circulation of an unpublished lecture, letter, drawing, or other ideal property, yet, would deny the same protection to a person, whose portrait was unauthorizedly obtained, and made use of, for commercial purposes. The injury to the plaintiff is irreparable ; because she cannot be wholly compensated in damages for the various consequences entailed by defendants' acts. The only complete relief is an injunction restraining their continuance. Whether, as incidental to that equitable relief, she should be able to recover only nominal damages is not material ; for the issuance of the injunction does not, in such a case, depend upon the amount of the damages in dollars and cents.

A careful consideration of the question presented upon this appeal leads me to the conclusion that the judgment appealed from should be affirmed.

O'Brien, Cullen and Werner, JJ., concur with Parker, Ch. J.; Bartlett and Haight, JJ., concur with Gray, J.

Judgment reversed, etc.