THE PEOPLE OF THE STATE OF NEW YORK on the Complaint of WILLIAM STERN, Complainant, *v.* ROBERT R. MCBRIDE & COMPANY, Defendant.

City Magistrates' Court of New York, Second District, Borough of Manhattan, March 23, 1936.

*Samuel Sherwood* and *Milton R. Kroopf,* for the complainant.

*Field & Field* [*Reginald Field* of counsel], for the defendant.

BRODSKY, C. M.  Invoking an alleged violation of his " right of privacy," under the provisions of section 50 of article 5 of the Civil Rights Law, the complainant, William Stern, charges that the defendant, Robert H. McBride & Company, is guilty of a misdemeanor, in that, in a book published by it, entitled " I Break Strikes," it " used a portrait of the complainant, as well as his name on the frontispiece of the book, and also printed his name on pages 4, 106, 113, and 258 thereof."

The book itself is in evidence.  Its subtitle is, " The Technique of Pearl L. Bergoff."  The book purports to give the history of the genesis, growth and development of professional strike-breaking, as a " peculiarly American Phenomenon," under the successive leadership and direction of three " private detectives "

(the last of whom, Bergoff, is the book's main and central character), until it evolved into its present status of a highly profitable " industry." The author, writing with " drama and gusto," charges that the men used to break strikes under Bergoff, referred to as " The Bergoff Army," are hoodlums, gunmen and others of criminal propensities and practices and that the methods used by them in breaking strikes are those of unlawful intimidation, criminal violence and other criminal means. He gives a merciless exposé, in historical sequence, of alleged specific instances of the uses of these illegal instrumentalities.

The book is undoubtedly a severe arraignment of, and a sincere protest against, a comparatively modern institution, with which the author is unsympathetic and one which he considers so utterly foreign and inimical to American social traditions and ideals that it should be excised as an unhealthy growth menacing the welfare of the body social. The book in style and scope reflects the author's convictions and is palpably written to focus public attention on the impending danger to America from such activities, as he sees it.

The frontispiece referred to contains nine portraits of different men, including that of the complainant, with the subjoined legend, " They Preserve Order; Members of the Bergoff Army." The pictures are identified in descriptive printed matter under the legend. Stern's picture is identified as that of William Kid Steinie; and it is stated that two of those identified as well as Stern " have been convicted of manslaughter." (Stern's conviction for manslaughter, I am informed, has been reversed and the indictment dismissed.)

On page 4 of the book the complainant's name is used in the statement: " William Stern, better known as Kid Steinie, had been made a lieutenant (of a proposed gathering by Bergoff of ' recruits ' to break a particular strike)." On page 106 complainant's name is mentioned among those who, " for manslaughter " are " all virtuosi in their respective methods." On page 113, among those of the " Bergoff Army " deserving of " special mention " is mentioned Stern's name in the following connection:

" *William Stern*, alias Herman Kudish, Henry Smith, Kid Steinie.

" Petty Larceny, September 17, 1911, New York City. Three months.

" Lewd and lascivious cohabitation, December 31, 1914, Boston. Three months.

" Homicide, October 11, 1920, New York City. Ten to twenty years in Sing Sing.

" *Worked for Bergoff from 1933 to 1935.*"

And on page 258: "For many of his nobles, Bergoff drew on the gangster followers of Kid Steinie, a small time East Side gunman."

These four are the only instances in which the name of the complainant is used in the book. The book contains 314 pages. Hundreds of other names are used throughout the 314 pages in the course of the chronicling of the events, constituting the author's history of strike-breaking as he conceives and presents it. Most of these other names are likewise used in connection with descriptive or identifying matter or the statement of alleged acts, casting or tending to cast the stigma of public odium, obliquy, ignominy degradation or incrimination on those named. No special prominence is given, typographically or otherwise, in the book to Stern's name over these other names. They are all mentioned incidentally to the author's unfolding of the historical narrative of strike-breaking which the book purports to set forth as those of persons identified with the movement. One must read the book before he comes across the name of Stern. Likewise no mention is made of Stern's name on the cover of the book or on the jacket. Bergoff's name only is mentioned. So too the picture nowhere appears except in the frontispiece together with the other eight. It is not claimed, and no testimony to that effect was offered by the complainant, that either the name, Stern, or his picture was used in or on any printed public notice, as advertising matter or in connection therewith, which calls the book itself to public attention for the purpose of furthering or exploiting its sale or otherwise. In short, neither the picture nor the name was used, so far as appears from the record, in this case, to advertise the book.

There is likewise no proof offered by the complainant that either his picture or his name was used, directly or indirectly, in connection with the offer of the book for sale, its distribution to book sellers, the exhibition of the book for sale to the public, the exploitation of the sale of the book, the actual sale of the book itself for any other trade purposes, connected with the marketing of or trafficking in the book. It was only after a book was sold to and read by the buyer that the picture and name were seen by him

It is conceded by the defendant that its business was the publication of books; that the book in question was printed and circulated solely for the purpose of profit and that it had never obtained the consent of complainant to the use of his name or picture in the book.

Counsel for the complainant again expressly concedes in his brief that "the book is non-fiction, dealing with a *history* of strike-breaking."

So far as the court has been able to determine from an exhaustive search of the reported cases, this is the first time that an alleged aggrieved party has resorted to the purely penal provision of section 50 of the Civil Rights Law, by seeking to have an alleged violator of his " right of privacy " held for the commission of a crime instead of pursuing his remedy, if any, by way of a civil action for an injunction and for damages under section 51.

The court's survey of the question involved and the conclusion arrived at will be stated, therefore, with what otherwise might possibly be deemed undue prolixity.

Article 5 of the Civil Rights Law as well as section 50 thereof is entitled " Right of Privacy." This expression has been used in connection with the discussion of those intangible legal rights which have been rather vaguely defined as " the right to live one's life in seclusion without being subjected to unwarranted and undesired publicity," or " right to be let alone," or right to be free from unwarranted publicity or right to live without unwarranted interference by people in matters with which it is not necessarily concerned. (*Roberson* v. *Rochester Folding Box Co.*, 171 N. Y. 538, 543; *Melvin* v. *Reid*, 112 Cal. App. 285; 297 Pac. 91, 92; *Rhodes* v. *Graham*, 238 Ky. 225; 37 S. W. [2d] 46; *Jones* v. *Herald Post Co.*, 230 Ky. 227; 18 S. W. [2d] 972, 973; *Brents* v. *Morgan*, 221 Ky. 765; 299 S. W. 967, 970; 55 A. L. R. 964.)

It is said to have been introduced into the discussion of legal rights in an article by Samuel D. Warren and Louis D. Brandeis (the present illustrious member of the United States Supreme Court)· in the December, 1890, number of the Harvard Law Review (Vol. 4, p. 193). The authors use this phrase (and after that it seems to have come into general use) to express their conception that every person has an absolute right not to be interfered with to his danger or discomfort, as well as by an act, on account of which he claims reparation or protection merely because it affects his sensibilities by exposing him to a powerful and humiliating publicity, as by an act which affects his well-defined and classified right of property or of personal liberty or of security or his right to his reputation. Such a " right of privacy " in the sense used by these authors had never been recognized at common law. The constitutional right to be let alone refers only to the right to be free from bodily injury or from a reasonable fear of bodily injury at the hands of a fellow being, and does not include a right to be free from public comment. (*Henry* v. *Cherry & Webb*, 30 R. I. 13; 73 Atl. 97, 100; 24 L. R. A. [N. S.] 991; 136 Am. St. Rep. 928; 18 Ann. Cas. 1006.)

The law does not discriminate between those who are sensitive and those who are not and the brutality of the remarks which while slanderous *per se* if said in the presence of a third person, are not actionable if addressed to the object in private, makes no difference. Yet the alleged law of privacy is involved. This law of privacy seems to have obtained a foothold at one time in the history of our jurisprudence, not by that name, it is true, but in effect. It is evidenced by the old truth, the greater the truth the greater the libel, and the result has been the emphatic expression of public disapproval by the emancipation of the press and the establishment of freedom of speech and the abolition in most States of the maxim quoted by constitutional provisions, the limitations upon the exercise of these rights being the law of slander and libel, whereby the publication of an untruth that can be presumed or shown to the satisfaction, not of the plaintiff, but of others, (*i. e.*, an impartial jury) to be injurious not alone to the feelings but to the reputation, is actionable. The law does not remedy all evils. We do not wish to be understood as belittling the complaint (one to restrain the use of the name and likeness of a deceased person as a label to be used in the sale of a cigar named after him). We have no reason to doubt the feelings of annoyance alleged. We can only say that it is one of the ills that under the law cannot be redressed. (*Atkinson* v. *Doherty & Co.*, 121 Mich. 372; 80 N. W. 285, 286; 46 L. R. A. 219.)

In *Roberson* v. *Rochester Folding Box Co.* (171 N. Y. 538), after an examination of the history of the phrase "right of privacy," a collating, examination and discussion of the cases directly and indirectly bearing upon it (including those which rather by way of dictum than decided principle, where rights of property and not pure personal rights were concerned might have seemed to recognize the existence of a "right of privacy"), our Court of Appeals finally repudiated the doctrine that the "right of privacy" has any existence in law or is enforcible in equity. The court said:

"The so-called right of privacy is, as the phrase suggests, founded upon the claim that a man has the right to pass through this world, if he wills, without having his picture published, his business enterprises discussed, his successful experiments written up for the benefit of others, or his eccentricities commented upon either in handbills, periodicals, or newspapers * * *. If such a principle be incorporated into the body of the law through the instrumentality of a court of equity, the attempts to logically apply the principle will necessarily result, not only in a vast amount of litigation, but in litigation bordering upon the absurd, for the right of privacy, once established as a legal doctrine, cannot be confined to the

restraint of the publication of a likeness but must necessarily embrace as well the publication of a word-picture, a comment upon one's looks, conduct, domestic relations or habits.

" * * * An examination of the authorities leads us to the conclusion that the so-called " right of privacy " has not as yet found an abiding place in our jurisprudence, and, as we view it, the doctrine cannot now be incorporated without doing violence to settled principles of law by which the profession and the public have long been guided " (p. 556).

The next case involving this question, in its purely civil aspects, came up after the passage of the Civil Rights Law (Laws of 1903, chap. 132) in *Rhodes* v. *Sperry & Hutchinson Co.* (193 N. Y. 223, 226), where Judge BARTLETT said:

" In the case of *Roberson* v. *Rochester Folding Box Co.* (171 N. Y. 538) this court determined that in the absence of any statute on the subject the right of privacy as a legal doctrine enforcible in equity did not exist in this state so as to enable a woman to prevent the use of her portrait by others for advertising purposes without her consent. In the prevailing opinion in that case, however, Chief Judge PARKER suggested that the right of privacy to that extent might properly be protected by an act of the Legislature, saying: ' The legislative body could very well interfere and arbitrarily provide that no one should be permitted for his own selfish purpose to use the picture or the name of another for advertising purposes without his consent.'

" Chapter 132 of the Laws of 1903 was passed at the very next session of the Legislature after this judicial utterance was made public and there can be little doubt that its enactment was prompted by the suggestion which I have quoted."

It was not, however, until *Binns* v. *Vitagraph Co.* (210 N. Y. 51) that the extent of the statutory civil remedies were considered. In that case Judge CHASE said: " The statute is very general in its terms, but when a living person's name, portrait or picture is used, it is not necessarily and at all times so used either for advertising purposes, or for the purposes of trade. The statute is in part at least penal, and should be construed accordingly. So construed, and also construed in connection with the history of chapter 132, Laws of 1903, which was enacted at the first session of the Legislature after the decision in the *Roberson* case, it does not prohibit the use of the name, portrait or picture of a living person * * * in truthfully recounting or portraying an actual current event as is commonly done in a single issue of a regular newspaper."

A mere reading of the provisions of section 50 should suffice to show that its application is limited to the interdiction only of two specific uses of a living person's name or picture, without his consent and that is, the use for advertising purposes and for the purposes of trade, and that these provisions have no application to the use of such name or picture, as part of or in connection with, the text itself or (in the case of a picture) to illustrate the text (as contradistinguished from mere advertising matter or trade use by word or picture) in a newspaper or magazine article or in a book. And so the cases where the sanction of the purely civil remedies were invoked have uniformly held. (*Colyer* v. *Fox Publishing Co.*, 162 App. Div. 297; *Jeffries* v. *N. Y. Evening Journal Publishing Co.*, 67 Misc. 570; *Ellis* v. *Hurst*, 70 id. 122; *Humiston* v. *Universal Film Manufacturing Co.*, 189 App. Div. 467; *Damron* v. *Doubleday, Doran & Co., Inc.*, 133 Misc. 302; *Martin* v. *New Metropolitan Fiction, Inc.*, 139 id. 290.)

And in these cases reference is frequently had to the " in part at least penal " characteristics of the statute, from which it is argued that the statute being in derogation of the common law should be strictly construed in so far as it purports to limit or restrict the application of the common law. *A fortiori*, should the act in question be strictly construed where it is sought to punish an alleged infraction of its provisions as and for a crime.

Under the heading " Freedom of Speech and Press," the Constitution of the State (Art. 1, § 8) provides that " every citizen may freely speak, write and publish his sentiments on all subjects." There is no limitation of these rights except that, if the citizen abuses the right, he shall be responsible. The responsibility referred to is one to answer either civilly or criminally for libel. " ' The liberty of the press * * * consists in the right to publish, with impunity, truth, with good motives, and for justifiable ends, whether it respects governments, magistracy or individuals." (*People* v. *Most*, 171 N. Y. 423 [1902].)

To give to section 50 the construction contended for by the complainant would necessarily impute to the Legislature an intent in its enactment to restrain or abridge the liberty of the press, in disregard of the express prohibition of article 1, section 8, of the Constitution that " no law shall be passed to restrain or abridge the liberty of speech or of the press."

I find that the charge is unsubstantial in law and in fact and I accordingly dismiss the complaint.