## RICHMOND NERVINE COMPANY v. RICHMOND.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE SOUTHERN DISTRICT OF ILLINOIS.

No. 59. Argued April 30, May 1, 1895.—Decided October 21, 1895.

The fact that a trade-mark bears the name and portrait of the person in
whose name it is registered does not render it unassignable to another.
On the facts this court reverses the decree of the court below.

THIS was a bill in equity filed by the Dr. S. A. Richmond
Nervine Company, a Missouri corporation, against Samuel A.
Richmond, the founder of the corporation, and a citizen of
Illinois, to enjoin the use of a certain trade-mark, and to
recover damages and profits for the unlawful use of the same.

The facts of the case were substantially as follows: The
defendant Richmond, prior to December, 1877, being engaged
at St. Joseph, Missouri, in the business of making and selling
a preparation known as "Samaritan Nervine," a medicine for
the relief of epileptic fits and similar diseases, adopted as a
trade-mark the figure of a man in an epileptic fit falling
backwards, with his arms extended, and his cane and hat
dropping to the ground, with the word "trade" printed in
small capitals on the right side of the figure, and the word
"mark" printed in small capitals on the left side. This trade-
mark was duly registered in the Patent Office, March 26, 1878,
and was imprinted upon the wrappers which enclosed the bot-
tles in which the medicine was sold, and was used from the day
of its adoption in 1873 or 1874 continuously until a change in
the size and character of the bottle and trade-mark was made
in the spring of 1884. Dr. Richmond met with considerable
success in the sale of his medicine, and was reasonably pros-
perous until just prior to 1882, when he became embarrassed
and unable to pay his debts, the result of engaging in a hotel
venture in St. Joseph, which proved disastrous.

In May, 1882, there was organized by Richmond and two of

his clerks, under the laws of Missouri, a corporation under the name of the " Dr. S. A. Richmond Medical Company," hereinafter called the " Medical Company," for the purpose of manufacturing and selling the Samaritan Nervine and Nervine Pills. The capital stock of the corporation was fixed at five thousand dollars, divided into 50 shares, of which James H. Richmond, a brother of the defendant, was named as the owner of 48, and John Albus and Michael Draut, the other two incorporators, of one share each. The property of Dr. Richmond, viz., the receipt for making the nervine and pills, the right to manufacture them, the trade-mark of the man falling in a fit, the outfit or plant for manufacturing the medicine, with the good will of the business, were assigned by Dr. Richmond to the Medical Company in consideration of five thousand dollars, the amount of the capital stock.

Long prior to this, however, and in December, 1871, defendant Richmond was married to Eva E. Shannon, who appears to have received from her father some money, together with the proceeds of some real estate, which she loaned to her husband to aid him in the prosecution of his business. To secure her for the money thus contributed, James A. Richmond, the Doctor's brother, on May 5, 1882, assigned to her 47 shares of the stock he held in the Medical Company. These shares she held until the company made an assignment for the benefit of its creditors and ceased to do business, as hereinafter stated.

Dr. Richmond became the general manager of the company, had charge of its business, superintended the preparation and putting up of the medicine, purchased bottles, wrappers, etc., attended to the advertising and sales, and was paid by the company for his services a salary of $200 per month, and in addition was allowed free of cost such medicines made by the company as were needed to supply the patients he was personally treating. He subsequently became president, and also acted as treasurer of the company, which advertised the Samaritan Nervine very extensively, using the trade-mark, bottles, and wrappers assigned to it by Dr. Richmond. The company continued prosperous from its organization in May,

1882, until May 13, 1884, when it made an assignment for the benefit of its creditors under the laws of the State of Missouri.

Before this, however, and in November or December, 1883, Dr. Richmond, who was then president and manager of the company, recommended a change in the size of the bottles, and the adoption of a new trade-mark, to wit, an eight-ounce bottle with his own portrait blown in the side, with the words "Samaritan Nervine" and "New Style," and that the new trade-mark consist of a portrait of himself surrounded by four globes or hemispheres stamped or engraved on the outside wrapper of the bottle. This new style, as it was called, was adopted by the company, Dr. Richmond gave orders to the Kellogg Engraving Company of Chicago for engraving the new trade-mark, and early in 1884 ordered a large quantity of eight-ounce bottles from a firm in Pittsburg to be made in accordance with the new style adopted by the company, together with cartoons with the trade-mark printed thereon. Upon the adoption of this new style of bottle and trade-mark, a circular was prepared by him notifying customers of the company and the trade generally of the change made by the company in the size of the bottles, the wrapper, and the trade-mark. This circular described the new bottle and the trade-mark, announced that they would go into use on the first day of May, 1884, and that medicines put up in any other style would not be genuine. They were sent to the trade generally in the United States and Canada. The old style of bottle and the old trade-mark of a man falling in a fit were discarded, except as to stock on the market, which had been prepared prior to the change.

On May 13, 1884, a meeting of the directors was held, at which Dr. Richmond announced that, owing to certain claims being pressed, which the company could not pay, it was insolvent, and upon his recommendation a resolution was adopted directing him to execute an assignment of the property, effects, assets, and business of the company for the benefit of its creditors. An assignment was executed to one John F. Tyler the same day, including all the property of the

company, advertising materials, printed matter, circulars, elec-trotypes, medicine bottles, and materials on hand for the manufacture of medicine, and all and every article of property or right belonging to the company.

The assignment appeared to have been entirely unnecessary, and was probably a scheme of defendant's to get possession and control of the company's assets, but it seemed to have been regularly made, and the assets appraised upon an estimate placed upon them by defendant at the sum of $998. Immediately thereafter, to wit, May 16, 1884, the property and assets of the company were sold to one C. W. Wolverton, of Tuscola, Illinois, who was the attorney of James A. Richmond, for the sum of $1000, two dollars more than the appraised value. Wolverton promptly assigned whatever interest he took by the purchase to one Powell, to whom the assignee refused to deliver the assets, having discovered the fraud, and Powell sued out a writ of replevin and thereby got possession of such corporeal property as the officer holding the writ could take and deliver.

It appeared that Dr. Richmond went to Chicago in July, 1884, and began there to manufacture the Samaritan Nervine, to use the bottles and trade-marks that had been adopted and procured by the Medical Company before the assignment, including both the old and new trade-mark, and also to use the good will of the company. He carried on this business under the name of the "World's Medical Association" for about three months, under a pretended lease from Powell, the second vendee from the assignee of the Medical Company.

As soon as the sale of the property and effects of the company for $1000 became known to the creditors, they filed a petition in the Circuit Court of Buchanan County, Missouri, to set aside the sale to Wolverton upon the ground that it was fraudulent and void as against creditors; and the court, on hearing the evidence, on June 23, 1884, decided that the sale was fraudulent and void, and ordered that the property be resold for the benefit of creditors, which was done, and on August 28, 1884, James A. Richmond purchased it for $25,000, which sale was subsequently confirmed by the court.

Richmond paid $2500 on the purchase, and gave security for the balance, $22,500, which, however, was never paid by him. On December 11, 1884, the "Dr. S. A. Richmond Nervine Company," plaintiff, hereinafter called the Nervine Company, was organized under the laws of the State of Missouri by James A. Richmond, Michael Draut, and John Christ, Richmond being elected president. A resolution was then adopted electing Dr. S. A. Richmond treasurer and general manager of the company, at a salary of $200 per month, with power, together with the president of the company, to execute all contracts for carrying on its business.

James A. Richmond transferred to the company his interest in the receipt for the manufacture of the medicine, the trademark, and all his personal property, and an assignment was also obtained from Powell of any right he claimed to have acquired by reason of the original sale by the assignee to Wolverton. The Nervine Company then became the sole and exclusive owners of all the property and effects of the original company, which had been assigned to Tyler for the benefit of its creditors, together with the right to manufacture and sell the medicines and to use the trade-marks, bottles, wrappers, etc.

In January, 1886, after the company had been doing business about two years, Dr. Richmond having become involved in certain legal proceedings, ceased his connection with the company, and was subsequently sent to an asylum; where he remained until November, 1887. During this time his wife, who received seventeen shares in the Nervine Company, took charge of the business and successfully conducted it until it was enjoined by the court below in this suit. After he left the asylum Dr. Richmond did not return to his family, but went to Tuscola, Illinois, began the manufacture of the nervine, as he had done in Chicago, using the trade-marks, bottles, wrappers, and good will of the company without its knowledge or consent, claiming that everything was his own in equity at least. He subsequently had the trade-mark, consisting of his portrait, surrounded by four globes or hemispheres, registered as his own.

Thereupon the doctor was notified by the company to cease manufacturing the medicine and using the trade-mark, and upon his refusal this bill was filed against him, praying for an injunction and an accounting.

To this bill Dr. Richmond filed an answer and a cross-bill, denying that the plaintiff company owned or had ever owned the trade-mark in question, or any of the interests claimed by it, or had ever used or had a right to use the eight-ounce bottles, or any trade-marks in connection therewith, except by his permission and subject to his right to terminate such use. He averred that the trade-marks and good will of the business were his own; that he only leased them to the plaintiff company; denied that his wife ever had any interest in the stock of the old or new company, and averred that whatever stock she held was his, and held only by her as trustee for him.

Upon a hearing upon pleadings and proofs a decree was entered dismissing the original bill, and decreeing upon the cross-bill that the Nervine Company be enjoined from making or selling the medicines or using the bottles, wrappers, or trade-mark of the portrait of Dr. Richmond surrounded by the four globes, known as the new trade-mark. From the decree plaintiff appealed to this court.

*Mr. Benjamin Butterworth,* (with whom was *Mr. Julian C. Dowell* on the brief,) for appellant.

*Mr. William Henry Browne* for appellee.

Mr. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

The record in this case presents only questions of fact, in which are involved the ownership of a trade-mark devised by Dr. Richmond in December, 1883, consisting of a portrait of himself, surrounded by four globes. Plaintiff's theory in this connection is that the trade-mark in question was designed by Dr. Richmond while acting as president and manager of the Medical Company; was adopted and, if not used, was advertised as about to be used, by that company prior to its

assignment on May 13, 1884; that it passed to Tyler, the assignee of such company, by virtue of the general assignment made upon that day, for the benefit of its creditors; that by him it was sold to James A. Richmond, with the other assets of the Medical Company, August 28, 1884, Richmond in turn assigning and transferring it to the Nervine Company, the plaintiff in this suit.

The theory of the defendant is, as stated in his testimony, that the Medical Company never acquired any property or assets; that he, the defendant, had arranged with his brother, with the two other stockholders of the company, and his wife Eva, before the company was organized; that the transfer of the property was for his own benefit, and the stock all issued in trust for him; that the sale to the Medical Company of the property mentioned was a mere form; that he decided in the fall of 1884 to change the trade-mark and wrapper from the old style to the new style; that he spoke to his brother about it, and stated to the company that he would lease his trade-mark, viz., the portrait of himself, surrounded by the four globes, to the company, provided they compromised with one Hubbard of New Haven, to whom the company had become indebted in the sum of $33,000 for advertising; that he had engravings made in Chicago on his own account, for his own benefit, and paid for them himself; that he subsequently went to Philadelphia, after the engraving was done, and ordered boxes, cartoons, caddies, etc., for himself, on his own account, and paid for them himself, though he may have used the company's money and signed the company's check for the amount; that the money was in fact his; that the company made an assignment, but failed to lease his trade-marks owing to the claim of Hubbard not being settled or arranged. If, as he swears, the Medical Company was but another name for himself and belonged to him, it is difficult to see why he should have ordered the engravings, bottles, and cartoons on his own account and paid for them with his own money as distinguished from the money of the company, or why he should have talked as he did about separating from the company and entering into business on his own account.

He further states that he did lease the trade-mark in question to the Nervine Company about December 11, 1884, when he became the general manager of the company, and had charge and control of its business up to January, 1886, soon after which he became, incapacitated and insane; that in the latter part of 1887 he notified the Nervine Company to cease using his trade-marks, and finally, in 1889, brought suit to compel them to do so.

There is a large amount of testimony in the case which is manifestly irrelevant to the question in issue. While it is entirely possible that the Medical Company may have been organized for the purpose of enabling Dr. Richmond to avoid individual liability, and the stock which properly belonged to him put in the name of the nominal stockholders in pursuance of a scheme to defraud his creditors, the existence of this corporation cannot be ignored in this proceeding. Were the proof never so satisfactory that the 47 shares of stock of the Medical Company transferred by defendant's brother to his wife Eva were in fact intended to be held in trust for him, we could not assume that she was not the *bona fide* owner of the stock standing in her name, as the object of this suit is not to impeach such ownership; nor could it be done in any suit to which she was not a party.

The real question is whether on May 13, 1884, the date of the general assignment to the Medical Company, it was then the owner of the trade-mark in question, since if it were, it passed to the assignee of the corporation as a part of its assets. Upon this point there is considerable conflict of testimony. Prior to 1884 the only trade-mark in use by the Medical Company was that of a man falling in a fit, and this it is admitted passed to the assignee, and is now the property of the plaintiff. There is no doubt that Dr. Richmond, in November or December, 1883, while acting as president and manager of the company, devised the trade-mark in question, and made all the necessary arrangements for the intended change in the size of the bottle and in the trade-mark; that advertisements were put into circulars notifying the trade that the change would take place on the first of May, 1884: that the

bills for engraving this trade-mark were all paid for by the company and charged, not to Dr. Richmond personally, but to the expense account of the company; that the circulars announcing the proposed change were printed and circulated in January and February of that year, under the supervision of Dr. Richmond; that these circulars contained a fac-simile of the cartoon or caddy as it would appear, together with a notice warning the public that none would be genuine unless thus encased, and bearing the following inscription : "Have Dr. Richmond's picture blown in the bottle, his picture to be printed on two sides of the caddy or cartoon, and the bottle enlarged;" that orders were placed for the new style of bottle with a Pittsburg firm, and were paid for by the company on delivery. Some of these bottles were received about the first of May, while Dr. Richmond continued to be superintendent of the company, and a memorandum of their payment appears upon the cash book of the company. There was also an order placed for cartoons to be used after May 1 for wrapping or encasing the nervine preparation, which were also paid for by the company. These cartoons contained the words : "Put up or prepared by the Dr. S. A. Richmond Medical Company." After Dr. Richmond left St. Joseph and went to Chicago, the words "Prepared by the Dr. S. A. Richmond Nervine Company" were changed to "Prepared by the World's Medical Association," the name under which defendant did business in Chicago. While it is doubtful whether the Medical Company actually sold any medicines put up in the new bottles, and encased in the new wrappers and bearing the new trade-mark, before its assignment, there is no doubt that a large quantity of these bottles, cartoons, and wrappers were on hand at the time of such assignment, which had been paid for and belonged to the company. Nor is there any doubt that after the organization of the Nervine Company, these bottles, wrappers, and trade-marks were made use of by such company, the plaintiff in this case, so long as Dr. Richmond continued to be its general manager. Defendant claims that this was done under a lease from himself, which was in writing, but this lease is

neither produced nor accounted for, and in his cross-bill only an oral license is claimed. The business done by Dr. Richmond in Chicago from July to October, 1884, under the name of the World's Medical Association, appears to have been a mere episode, as he resumed business in St. Joseph upon the organization of the plaintiff company in December, 1884, and continued with them until January, 1886.

The testimony of Dr. Richmond, who was the main witness in his own behalf, is materially impaired, not only by his own confession that the organization of the Medical Company was procured by himself for the purpose of defrauding his creditors, and that the first appraisement and sale of its assets were also a fraud concocted by him for the same purpose, but by the further fact that, in a suit brought at Columbus, Ohio, against him for advertising, he swore that he owned none of the stock of the Medical Company, and that he had no interest in such stock. A witness, who at different times gives different versions of the same transaction, and blows hot or cold as his interest in the particular litigation may require, can scarcely complain if the court fail to give his testimony the weight to which it would otherwise be entitled.

In fine, we are of the opinion that the Nervine Company is justly entitled to the use of the trade-mark in question.

The fact that such trade-mark bears Dr. Richmond's own name and portrait does not render it unassignable to another. *Kidd* v. *Johnson*, 100 U. S. 617, 620; *Brown Chemical Co.* v. *Meyer*, 139 U. S. 540; *Hoxie* v. *Chaney*, 143 Mass. 592, 595; *Fish Bros. Wagon Co.* v. *La Belle Wagon Works*, 82 Wisconsin, 546.

The decree of the court below must be

*Reversed, and the case remanded for further proceedings in conformity with this opinion.*