UPROAR CO. v. NATIONAL BROADCASTING CO. et al.
No. 5494.

District Court, D. Massachusetts.
Oct. 10, 1934.

Arthur Berenson, Bernard Berenson, and Israel Gorovitz, all of Boston, Mass., for plaintiff.

Powers & Hall and Leland Powers, all of Boston, Mass., for defendant Texas Co.

Stuart C. Rand, Warren B. Manhard, and Choate, Hall & Stewart, all of Boston, Mass., and A. L. Ashby and E. Stuart Sprague, both of New York City, for defendant National Broadcasting Co.

BREWSTER, District Judge.

This suit was begun as an action at law. The plaintiff, in its declaration, alleged that by mesne assignment it had acquired of Ed Wynn, or his sole representative, the right to publish in pamphlet form the subject-matter of his broadcasts over the N. B. C. chain as a part of the advertising program sponsored by the defendant the Texas Company. It alleged: That it was essential that the right to sell, to distribute, and to advertise the publication be enjoyed simultaneously with the broadcasting of the program; that the defendants had conspired to prevent the plaintiff from advertising the publication over the broadcasting chains controlled by the defendant National Broadcasting Company, and had unlawfully interfered with and caused to be canceled contracts entered into with other broadcasting companies for advertising, by means of the radio, the publication; and that it was entitled to damages both at common law and under the anti-trust laws.

Each defendant, in an amended answer, has interposed a defense which it asserts is an equitable defense, and has asked for affirmative relief. The gist of the defense, thus pleaded, is that the sale, distribution, and advertising of the publication will infringe contract rights which have accrued to the defendants, respectively, entitling them to injunctive relief.

The defendants further claim that the matters set up in the amended answers constitute a complete defense to the plaintiff's action at law.

The issues raised by this defense were heard by the court, sitting in equity, upon evidence submitted by the defendants which fully establishes the facts alleged in the defendants' amended answers. There is little room for controversy regarding the pertinent facts, which may be briefly stated as follows:

Prior to October 1, 1932 (the date when the plaintiff's assignor acquired the alleged publication rights from Wynn), the defendant the Texas Company had entered into a contract with Wynn and/or his exclusive representative, by the provisions of which Wynn agreed to render service as an artist "and to supply the necessary personal script for broadcasting over the radio" for a broadcast of one-half hour each week, for which the Texas Company agreed to pay the sum of $5,000 for each broadcast. The contract in force October 1, 1932, was entered into on August 31, 1932. It was a renewal of an earlier contract in which the consideration stipulated was $3,500 for the performance alone, and $5,000 if the artist furnished the script. It is a fair inference that the parties intended that the compensation paid was not only for the performance, but for the script as well, and I so find.

The contract provided for one broadcast each week for 7 weeks beginning September 6, 1932, with an option for 52 additional weeks, which was exercised.

On March 16, 1932, the defendant the Texas Company, through its agent, entered into an agreement with the defendant National Broadcasting Company, whereby it obtained the facilities of an extensive chain of broadcasting stations for the presentation over the air of its advertising program, the material for which was to be furnished by the

National Broadcasting Company and/or by the agent of the defendant the Texas Company which had, on its behalf, entered into the contract with Wynn, above referred to. This contract, by mutual agreement, was extended and was in force on October 1, 1932, and so far as appears was effective up to the date of hearing.

The defendant National Broadcasting Company on the 3d day of December, 1929, entered into a written contract with Graham McNamee, whereby McNamee granted to this defendant the right "to the exclusive management of his services, trade name or names and productions for all purposes of whatsoever kind and nature"; McNamee agreeing that during the period of the contract he would not make any contract or contracts with others for his "services, trade name or names and/or productions except by and through" this defendant. He further agreed that he would not, during the term of the agreement, permit his name or photograph to be used in any manner for commercial purposes without the written consent of the broadcasting company, which was granted the right to use the name and photograph of the artist in any proper way in connection with advertising and publicity campaigns and for commercial purposes of any nature whatsoever, and to quote or write articles concerning the artist and publish the same. The rights granted could be sold by the broadcasting company on a royalty basis, or otherwise, or could be assigned to advertising agencies, advertising clients, or other parties who might be negotiating for the services of the artist. In consideration for the services of the artist, McNamee was to receive a certain percentage of the amounts received for broadcasting. The contract further provided that all publicity in reference to the artist should, during the period of the contract, be under the sole direction of the National Broadcasting Company. This contract, by mutual agreement, was from time to time extended and was in force on October 1, 1932, and was in effect up to the date of the hearing.

The defendant National Broadcasting Company through its artist's service, has created a commercial value in the name "Graham McNamee." He has been identified with the National Broadcasting Company for several years, and has never been identified with any other broadcasting company. He is known as one of the leading announcers in the field of radio broadcasting. The use of the word "Graham" would, in the public mind, mean Graham McNamee, especially if used in connection with the radio programs sponsored by the Texas Company.

The plaintiff never received any authority from McNamee or the National Broadcasting Company to use the name "Graham," and under the statutes of New York, securing the right of privacy, the unauthorized use of the name would subject the plaintiff to an injunction. New York Civil Rights Law (Consol. Laws, c. 6), art. 5, §§ 50 and 51. Binns v. Vitagraph Company, 210 N. Y. 51, 103 N. E. 1108, L. R. A. 1915C, 839, Ann. Cas. 1915B, 1024.

On March 16, 1932, the Texas Company, through its agent, entered into a contract with the defendant National Broadcasting Company by which the Texas Company engaged the artistic services of McNamee for broadcasting a series of radio programs for which the Texas Company agreed to pay $250 for each performance. By the terms of this agreement the defendant broadcasting company agreed that the artist would render services called for by the contract and granted to the defendant the Texas Company the right to use the name and/or likeness of the artist in any proper way in connection with the advertising of and/or the giving of publicity to the radio program sponsored by the defendant the Texas Company. In this contract Ed Wynn is not mentioned; but the dates correspond with the dates in his contract, and, in view of the programs which have been broadcast by the Texas Company, there can be no doubt that the services of Graham McNamee were secured to be utilized in connection with the broadcasting of the advertising program of this defendant.

There was in evidence a sample copy of the publication which the plaintiff proposed to advertise and sell. This purported to contain the full text of the "operas" which constituted a material part of the script furnished by Wynn under his contract. Part II, entitled "The Wynn-Mill" represented the dialogue which took place during the performance between Graham and Ed Wynn. In this part the name "Graham" appears no less than 45 times. The plaintiff solicits trial subscriptions to the "Uproars" (the title of the publication) for 10 weeks for $1; the regular price being $5 a year, single copies 10 cents. It was this publication, reproducing the subject-matter of the performance sponsored by the Texas Company, so far as Wynn and McNamee contributed to it, that the plaintiff intended to advertise over the radio. The plaintiff's charge is that the defendants have interfered with its rights to se-

cure broadcasting facilities for the purpose of advertising over the air the "Uproars."

It is the contention of the defendant the Texas Company that the plaintiff acquired no rights to publish the script used during the course of these broadcasts; that the publication violates exclusive rights acquired by this defendant, and that it is entitled to injunctive relief against the advertising, selling, and distributing of the publication. The contention of this defendant that the plaintiff secured no publication rights in the material produced for the Texas Company's broadcast is, in my opinion, sound. The script was prepared by Wynn under his contract with the Texas Company. He was employed at a munificent salary to furnish this material in addition to his services as star performer during the half hour of each week. Under these circumstances, his production belonged to the employer. The applicable doctrine would be analogous to that which controls when an inventor has been employed to exercise his inventive genius for his employer in a definite field. The employer, and not the inventor, owns the invention. Standard Parts Co. v. Peck, 264 U. S. 52, 44 S. Ct. 239, 68 L. Ed. 560, 32 A. L. R. 1033; Solomons v. United States, 137 U. S. 342, 11 S. Ct. 88, 34 L. Ed. 667; Houghton v. United States (C. C. A.) 23 F.(2d) 386.

This rule has been extended to literary productions. Sweet v. Benning, 16 C. B. 459; Lawrence & Bullen v. Aflalo, L. R. [1904] A. C. 17; Dielman v. White (C. C.) 102 F. 892.

The case at bar is not one in which an artist has first created literary property of general character and then granted to some one else all, or a portion, of his rights with respect to the production or publication of the same. Rather, it is a case in which the literary property has been created solely in pursuance of a contract of employment for the sole purposes of the employer for use upon a single occasion, and for a remuneration so large as to be entirely compatible with the idea that the services rendered were, in every sense, exclusive services.

While Wynn was featured as the star, the performance was a free offering to the public by the defendant the Texas Company as a part of its advertising program, adopted as a means of creating good will. In that sense, it was the defendants' show, and not Wynn's.

Once each show had been given, it had, in a sense, served its purpose. Any reservation by Wynn of a separate interest or ownership in the literary production, or any subsequent use thereof by him, would have been inconsistent with the contract which he had made with the Texas Company, under which he had been employed to create solely for the purpose of his employer for a single occasion.

The conclusion follows that the Texas Company became the sole proprietor and owner of the material contributed by Wynn to the broadcast, and that any use of it without its consent was unlawful and in derogation of defendant's exclusive rights.

As to the defense of the National Broadcasting Company, the contract between it and Graham McNamee purported to confer upon the company the sole and the exclusive right to the services of McNamee in connection with broadcasting, and also the right to use his name for commercial purposes, whether connected with broadcasting or otherwise. The name has acquired, through the efforts of McNamee and the National Broadcasting Company, a very substantial value, especially valuable for advertising purposes; and this definite commercial value exists apart from the services as radio announcer. Rights of a pecuniary nature have been created which partake of the elements of property rights, and which will receive the protection of equity. International News Service v. Associated Press, 248 U. S. 215, 39 S. Ct. 68, 72, 63 L. Ed. 211, 2 A. L. R. 293. These rights may properly be the subject-matter of a transfer from McNamee to the broadcasting company. Petrolia Mfg. Co. v. Bell & Bogart Soap Co. (C. C.) 97 F. 781; The Coca-Cola Bottling Co. v. The Coca-Cola Co. (D. C.) 269 F. 796; Brown Chemical Co. v. Meyer, 139 U. S. 540, 11 S. Ct. 625, 35 L. Ed. 247; Richmond Nervine Co. v. Richmond, 159 U. S. 293, 16 S. Ct. 30, 40 L. Ed. 155.

There arose from the contractual relations between Wynn and the Texas Company, and between McNamee and the National Broadcasting Company, negative covenants which required the artists to refrain from making or authorizing any use of the production which would diminish the value of that which each had furnished under the contracts above referred to. Harper Bros. v. Klaw (D. C.) 232 F. 609; Manners v. Morosco, 252 U. S. 317, 40 S. Ct. 335, 64 L. Ed. 590; Kirke La Shelle Co. v. Paul Armstrong Co., 263 N. Y. 79, 188 N. E. 163.

The plaintiff can have no greater right than Wynn or McNamee.

Both defendants complain that the plaintiff, in publishing "Uproars," has appropriated and will appropriate the good will which

the defendants have, at large expense, succeeded in creating, and to which the plaintiff has contributed nothing. In other words, that the plaintiff, for its own profit, is seeking to take an unfair advantage of the popularity of widely advertised programs, the proprietary interests in which belong exclusively to the defendants under their respective contracts with Wynn and McNamee.

This misappropriation and use by the plaintiff tends to impair the value of the exclusive rights which the defendants have acquired by cheapening the whole advertising program. There was evidence tending to show that those who were in the radio audience when the program was on were led to believe that the plaintiff's publication was put out by the defendants, or one of them.

The defendants say, with justice as I see the matter, that such a use would "detract from the unique quality and artistically complete effect of the defendant's advertising. It would tend to cause confusion in the minds of the public with respect to the relationship between the plaintiff and the defendant, and to create some degree of impression that the defendant was responsible for what the plaintiff might do." The cogency of the argument lies in the fact that the defendants have no control by way of censorship, or otherwise, of the matter that may appear in "Uproars." I have no hesitation in finding and ruling that the plaintiff is making a commercial use, wholly unauthorized, of the script and of the name "Graham."

■ While plaintiff's undertaking is not, strictly speaking, unfair competition in the sense that the plaintiff is attempting to palm off his goods for the goods of a competitor, it comes within the rule which the courts have frequently applied in cases of unfair business practices regardless of the element of competition. Aluminum Cooking Utensil Co. v. Sargoy Bros. & Co. (D. C.) 276 F. 447; Aunt Jemima Mills Co. v. Rigney & Co. (C. C. A.) 247 F. 407, L. R. A. 1918C, 1039; Akron-Overland Tire Co. v. Willys-Overland Co. (D. C.) 273 F. 674; International News Service v. Associated Press, supra; Feldman v. Amos and Andy (Cust. & Pat. App.) 68 F.(2d) 746.

In International News Service v. Associated Press, supra, the court observed: "Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who

have earned it to those who have not. * * * The transaction speaks for itself and a court of equity ought not to hesitate long in characterizing it as unfair competition in business. * * * In a court of equity, where the question is one of unfair competition, if that which complainant has acquired fairly at substantial cost may be sold fairly at substantial profit, a competitor who is misappropriating it for the purpose of disposing of it to his own profit and to the disadvantage of complainant cannot be heard to say that it is too fugitive or evanescent to be regarded as property. It has all the attributes of property necessary for determining that a misappropriation of it by a competitor is unfair competition because contrary to good conscience."

While the plaintiff is not a competitor of either of the defendants, logically the same rule would apply to one misappropriating to his own profit, and to the disadvantage of the other, rights which the latter had acquired fairly and at substantial costs.

■ The rendering of the performance before the microphone cannot be held to be an abandonment of ownership to it by the proprietors or a dedication of it to the public at large. Ferris v. Frohman, 223 U. S. 424, 32 S. Ct. 263, 56 L. Ed. 492; Nutt v. National Inst. Inc. for the Improvement of Memory (C. C. A.) 31 F.(2d) 236; McCarthy & Fischer v. White (D. C.) 259 F. 364.

■ The plaintiff seasonably filed a motion to strike out the amended answers and duly objected to the admission of all evidence offered to establish the allegations of the answers on the ground that they do not constitute a defense which can be pleaded under 28 U. S. C. § 398 (28 USCA § 398) as an equitable defense. This statute provides that a defendant, in an action at law, may obtain equitable relief respecting the subject-matter of the suit by praying for such relief in his answer. The settled procedure is to have the equitable issue first disposed of as in a court of equity, and if an issue at law remains it will be tried to a jury. If the defense is maintained, the action at law will be enjoined. Liberty Oil Co. v. Condon National Bank, 260 U. S. 235, 43 S. Ct. 118, 67 L. Ed. 232.

■ Undoubtedly, in order to determine the nature and extent of the rights of the parties to this litigation, it is necessary to apply legal principles, but the law is not capable of giving affirmative relief. When the law affords no adequate remedy, the defendant may invoke the aid of a court of equity. People

of Porto Rico v. Livingston (C. C. A.) 47 F.(2d) 712, and cases cited in the opinion; Williams v. Mason (D. C.) 289 F. 812; United Timber Corp. v. Bivens (D. C.) 248 F. 554.

█ That the unlawful infringement of rights of the defendants which are threatened and the unfair practices contemplated by plaintiff entitle the defendants to injunctive relief seems to me to be clear. The defenses pleaded in the amended answers, therefore, are clearly equitable in character and were properly heard, as in equity, without jury.

The foregoing compels the conclusion that the defendants are entitled to a decree perpetually enjoining the plaintiff from prosecuting the action at law and enjoining the plaintiff from publishing, advertising, selling, or distributing the pamphlet entitled "Uproars," or any other publication containing the script furnished to the defendant the Texas Company under the contract above referred to, or any extension or renewal thereof; and from making any commercial use whatever of the name "Graham McNamee" so long as his contract with the National Broadcasting Company, or any extension or renewal thereof, is in force.

Plaintiff's motions to strike out the defendants' amended answers are denied.

The above, so far as it contains findings of fact, is submitted in compliance with plaintiff's motion for special findings of fact.