BOWMAN GUM, Inc. v. TOPPS CHEWING GUM, Inc.

Civ. A. No. 11852.

United States District Court
E. D. New York.
March 31, 1952.

John W. Thompson, New York City, for plaintiff. Daniel L. Morris, Robert D. Spille, New York City, Shapiro, Rosenfeld & Stalberg, Philadelphia, Pa., of counsel.

George E. Middleton, New York City, for defendant. Hubert Moore, Jr., New York City, of counsel.

GALSTON, District Judge.

In a single cause of action the plaintiff alleges trade-mark infringement, unfair competition and impairment of contract rights.

The parties are citizens of different states, the plaintiff being a Pennsylvania corporation, and the defendant a New York corporation.

The plaintiff and its predecessors have been and are engaged in the business of selling chewing gum throughout the United States. The chewing gum product is known in the trade as card bubble gum. The plaintiff claims to be the first to have employed picture cards featuring leading baseball players in connection with the sale of its product. "Play Ball" was its earlier trademark, used in the years 1939 to 1942 inclusive; in 1949 it adopted the trade-mark "Baseball". Bubble chewing gum was sold in packages which included serially numbered cards forming sets bearing the names,

pictures and biographical data of various well known baseball players.

Though the complaint alleges that the trade-mark "Baseball" "has been and is now widely and generally known to the public as identifying the origin of the plaintiff's said product," the proof does not establish that contention.

Plaintiff entered into contracts with 340 major league baseball players, pursuant to which it acquired the exclusive right from such players for limited "periods to exhibit, display, print and publish the name and/or signature, and/or facsimile thereof, and/or photograph, and/or descriptive biographical sketch of each of said players in the advertising, promotion and sale of chewing gum". In these contracts the players agreed that they would not grant to any other manufacturer of chewing gum the rights granted to plaintiff.

The defendant is charged with an invasion of the rights which the plaintiff claims to have established in connection with the distribution of its product under the trademarks referred to, and with the accompanying photographs of baseball players of the major leagues. It is claimed that the defendant placed on the market a product consisting of a flat, rectangular piece of sweet tasting substance, simulating a flat piece of chewing gum, and sold packages under the designation "Baseball Trading Card Candy". Each package of candy of the defendant includes a card which bears on one side markings of a baseball, the name, picture and biographical data of a player currently enrolled in one of the major league teams. The card forms one of a set of fifty-two photographs.

Plaintiff claims to be the owner of the exclusive rights in 1951 players' contracts, with some few exceptions, and claims that the defendant's packages, designated "Official Trading Cards", are sold and offered for sale with knowledge of plaintiff's exclusive rights, and without the consent of the major league clubs by which the pictured players are employed, and without the consent of the players whose 1951 contracts with the plaintiff precluded defendant from lawfully obtaining such consent. And plaintiff claims that with knowledge of the plaintiff's player contracts, some of which contain options, defendant has attempted to enter into agreements with major league baseball players who were under contract or option with the plaintiff; all of which has the effect, so it is alleged, of impairing the value of plaintiff's rights under its contracts.

In consequence the plaintiff seeks an injunction to restrain the defendant from using the word "Baseball", from publishing or using, in connection with its sales, any confection bearing the name, and any likeness or biographical data of any league baseball player in any baseball season during which plaintiff has the exclusive right to use any such player's name, likeness or biographical data; and from selling any product having the appearance of gum with the word "Baseball" in connection therewith.

The answer to the amended complaint puts in issue the charge that defendant's candy simulates the chewing gum of the plaintiff, admits that it sells packages of candy under the designation "Baseball Trading Card Candy", but denies that in so doing it invades any of plaintiff's rights; admits also the sale of "Official Trading Cards", but denies that such sale violates plaintiff's rights; admits that it has obtained from an organization known as Players Enterprises, Inc., the right to use the names, pictures and biographical data shown on its cards, resulting from the contracts which Players Enterprises have with the players; denies any confusion with plaintiff's products, and affirmatively charges that it has been common practice for fifty years or more, and still is, to include picture cards in packages of various merchandise, including chewing gum and candy; and that it has been customary to define such products as picture card gum, or candy or trading card gum or candy, as the case may be; also that the picture cards or trading cards included a variety of pictures including soldiers, sailors, battle-ships, flags, animals, Indians, prize-fighters, wild men, wild west scenes, football players, baseball players, etc.

The answer also raises the issue as to the validity of plaintiff's use of the term "Baseball", charging that when applied to the goods of the plaintiff it is devoid of trade-mark significance, and is incapable of acquiring trade-mark significance; and asserts that the term "Baseball" is used fairly and in good faith by the defendant only to describe to users the goods of defendant. Defendant claims that no one could possibly purchase defendant's picture card candy in the belief that he was getting plaintiff's baseball picture card gum.

As to the charge that defendant's conduct has impaired the value of plaintiff's alleged contracts, the defendant alleges that such claim fails to state a cause of action upon which relief can be granted, since the contracts which plaintiff made with the players at most constitute a waiver of the ball player's right of privacy, and convey no rights upon the plaintiff to sue a third party.

Defendant's rights to use the names and biographical sketches of baseball players, concerning which the plaintiff complains, are derived from contracts which Players Enterprises, Inc., or Russell Publishing Co. made with those ball players. Defendant had no direct dealings with the players. The defendant alleges too that the plaintiff knowingly induced many of these ball players to breach their contracts with the Russell Publishing Co. and with Players Enterprises. It is also claimed that the players who are under contract to the plaintiff were misled by the misrepresentations of plaintiff into believing that the negative covenant, like the release itself, was limited to chewing gum, and that the players signed in that mistaken belief.

The answer also sets up a counter-claim in the form of a declaratory judgment seeking the cancellation of plaintiff's registered trade-mark under section 1119, Title 15 U. S.C.A. It is claimed that this registration was granted contrary to the provisions of the Trade-mark Act of 1946, particularly section 2 thereof, 15 U.S.C.A. § 1052.

Summarized it may be said that though the plaintiff, in the sale of its bubble gum under some designation bearing the name "Baseball" and in packages containing photographs of baseball players, was in the field before the defendant, it was not first in the field to offer articles of merchandise for sale with picture cards of one kind or another, nor was it the first to use "Baseball" in connection therewith. For example, the system of doing business by enclosing pictures of baseball players with gum or candy was old before plaintiff sold baseball picture cards with its gum. The proof shows that the Goudey Gum Co. of Boston followed that practice from 1933 to 1945. Similarly the defendant did so in 1948, as did the Leaf Gum Co. of Chicago in 1948 and 1949. A like method of doing business was followed by the Philadelphia Chewing Gum Co. in 1949.

But let us first consider the charge of trade-mark infringement. The infringement complained of is the designation by the defendant of its products under names which include the term "Baseball". Plaintiff does not claim that its certificate of trade-mark, registration No. 546,225, containing the word "Baseball" repeated, and with pictures of ball players, presumably of a pitcher and a catcher, was infringed by the defendant; it relies rather on what it claims is its common law trade-mark—the term "Baseball" in connection with the sale of its bubble or chewing gum.

But the term "baseball" is not subject to monopolistic appropriation by the plaintiff. The term is generic and descriptive; nor is there any proof that as used by the plaintiff it acquired secondary significance as indicating the source or origin of the gum sold. Nor is there any secondary significance arising from the designation of the product in connection with the name of any famous player. The case might be different if the plaintiffs were selling a product under the designation of some one name. Such use might readily build up good will, and an invasion on the part of one not privileged to use the name would be subject to restraint. In the circumstances of this case though, we have no such situation. On the contrary, the facts and applicable law fall readily within such authorities as Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 113, 83 L.Ed. 73, in which it was held that

948

"Shredded Wheat" was a generic term, not subject to exclusive appropriation by the original maker of the product. The court said:

"But to establish a trade name in the term 'shredded wheat' the plaintiffs must show more than a subordinate meaning which applies to it. It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer."

See also Columbia Mill Co. v. Alcorn, 150 U.S. 460, 14 S.Ct. 151, 37 L.Ed. 1144; National Comics Publications, Inc. v. Fawcett Publications, Inc., 2 Cir., 191 F.2d 594.

Thus it must be concluded under the authorities that the term "baseball" is available to anyone, to be used freely if honestly employed.

**■** Secondly as to the claim of unfair competition, there is no suggestion in the record that the defendant was palming off its goods as the goods of the plaintiff. The dress and packaging of defendant's baseball trading card candy is outstandingly different from the dress and packaging of plaintiff's baseball picture card bubble gum. Also, though plaintiff gives the biographical data of the baseball player on the reverse side, that is not done by the defendant. Another item of difference exists between the posturing of the ball players on the plaintiff's cards and the absence thereof on the defendant's cards. There is no proof of any deception that was practiced on any of plaintiff's customers; and likewise the record is barren of any proof that there is likely to be any confusion among those who purchase the products of either, or that the defendant has offered them as the products of the plaintiff, directly or through devious means. The plaintiff, of course, acquired no monopoly right in its system of distributing its pictures with its gum.

That leaves for consideration the claim of impairment of plaintiff's contractual rights. Beginning in the playing season in 1948 and continuing through it, these contracts were procured for the plaintiff by an organization known as Art Flynn Associates. By the terms of these contracts the player gave plaintiff permission to use his name, photograph and biographical sketch in the advertising, promotion and sale of its chewing gum, and agreed not to give any other manufacturer of chewing gum the same permission. In the 1950 contracts, plaintiff was additionally given an option to renew for one year on the same terms as stated in the contracts that ran theretofore but for one year. Plaintiff paid as consideration the sum of $100 each year until the 1951 contracts were executed. They provided for payment to the player of a wrist watch. Significantly, the 1951 contract included for the first time the words "or confections". The inference seems irresistible that the inclusion of that right was predicated on a knowledge that the defendant was using baseball photographs to aid the sale of its candy. The first of such "or confections" contracts was signed on August 8, 1950. The current form of contract which the plaintiff has negotiated, and is negotiating, covers the period from January 1, 1952 to December 31, 1956, and includes the privilege to use the photographs not only with chewing gum but also with the sale of "confections or confectionery".

The history of the defendant's use of baseball players' photographs may be traced to the rights which it acquired from the Russell Publishing Company and Players Enterprises, Inc. The evidence shows that the former company was active in the spring of 1950 and entered into contracts with 248 active major league baseball players. It acquired for itself or its assignees or licensees the exclusive permission to use the names of the players, pictures and biographical data in "flip books", cards and labels in connection with the sale of any product except those which might be specifically named therein. Those contracts covered the period from October 2, 1950 to October 2, 1951, with an option for renewal for one year on the same terms.

At about the same time, that is to say in July, 1950, and through August and September of that year, another corporation known as Players Enterprises, Inc., entered into contracts with a number of active major league baseball players by the terms

of which that company obtained the sole right for a period of three years to license the use of the names of the players and their likenesses in connection with the manufacture and sale of merchandise. Also with knowledge that players had signed other contracts of a like nature, the Players contract provided that any prior contracts for the use of the player's name or likeness should not be affected, but the player agreed that he would not renew any such existing contract, and that all future agreements for the use of his name or likeness, except for testimonials, would be made through Players Enterprises, Inc.

The defendant, in December, 1950, acquired from Players Enterprises an exclusive license to use the players' rights which Players Enterprises had acquired in connection with the sale of candy for 1951, and of candy and chewing gum for 1952. It was pursuant to this license that the defendant brought out an issue of 1951 baseball picture cards with its candy in April, 1951. The scope of its distribution was also enlarged in April, 1951, when the Russell Publishing Company and Players Enterprises merged; and as a result the players under contract to Russell were also available to the defendant. Acting under such license from Players, the defendant distributed a second series of 1951 baseball picture cards with its candy in June, 1951.

Parenthetically it may be observed that the make-up of the sixteen major league teams, eight in the National League, and eight in the American League, shifts from year to year. Each club makes changes, not only between seasons but also during the playing season. At times old players pass out of the league and their places are filled by the younger men from the minor leagues or elsewhere. These continuing changes in the make-up of the baseball teams have made it necessary for all those who wish to obtain releases from players to negotiate with those who are not already under contract. So beginning in May, 1951, Players Enterprises entered into new contracts with 283 active major league baseball players by which the corporation acquired rights similar to those heretofore described. These contracts in the main covered the 1952 playing season and contained options for renewal. As before, the player agreed that during the term of such agreement he would not grant to anyone else the rights released to Players Enterprises, and would not renew any contract with others except such as might be listed.

The claim of the defendant is not only that it did not invade contractual rights of the plaintiff, but that it sought to be apprised as it took licenses from Players Enterprises, whether the player had committed himself under any other contract. There is no evidence that the plaintiff made any such inquiry prior to signing up for the players which it holds under contract. It may well be that plaintiff believed itself the first in the field and, therefore, thought it unnecessary to pursue any such investigation.

Another element that may be noted is that the defendant manufactures not only candy and chewing gum, but also toys, and has sold, independent of any commodity, sets of baseball trading cards.

A consideration of the law of the case in respect to the impairment of contracts as presented by the parties leads to the conclusion that the New York law must prevail. The signatures of the ball players to most of these contracts were obtained by Miss Joan Crosby and Mr. Jack Tanzer, as agents of the plaintiff. The contracts themselves do not state where they were executed. However, in Miss Crosby's deposition she states that most of the contracts were signed at the baseball parks over which she had "jurisdiction". She testified that these ball parks were the Yankee Stadium, Ebbets Field, and the Polo Grounds, all in New York City. Also, for the 1952 to 1956 contracts, Griffith Stadium in Washington, D. C., and Shibe Park in Philadelphia were included. The deposition of Jack Tanzer, also in evidence, does not disclose his territory. In addition, both depositions indicate that some of the contracts were received from the players with their signatures through the mail. No effort was made at the trial to show where the individual contracts had actually been executed.

950

Jurisdiction here is based upon diversity of citizenship. The plaintiff alleges that the interference complained of occurred within New York and within the territorial jurisdictions of this Court. In support of their contentions, both parties have based their arguments upon what they deem to be the law of New York. In view of the failure to distinguish the contracts individually as to the place of execution—indicating thereby a desire to treat the rights granted thereunder as being substantially alike—and the fact that the evidence indicates that most of the contracts were executed in New York, it may be assumed that the parties here take the position that the applicable state law is that of New York.

The plaintiff's case, narrowed down as I have indicated, thus poses the problem as to the nature and extent of the rights that it acquired under the contracts that it has with the ball players. To put it otherwise, did the plaintiff, as a result of these contracts, acquire the right to prevent others from using the photographs of these players; or, as the defendant contends, did the plaintiff get merely releases or waivers, i. e., the right to use the rights described in the player contracts?

It is clear that in none of the contracts with the ball players, with either plaintiff or defendant, was there a mention of any right on the part of the plaintiff or defendant to pursue others, persons who without players' consent used photographs and data in connection with the sale of commercial products.

There is not to much authority to guide us to the solution of this problem.

In Roberson v. Rochester Folding Box Co., 171 N.Y. 538, 64 N.E. 442, 59 L.R.A. 478 it was held that there was no common law right to prevent the unauthorized publication and distribution of a person's portrait or photograph. The court declared that the act complained of was an invasion of the right of privacy, which it held to be an interest in an "inviolate personality" rather than of private property. Subsequent to the Roberson decision, legislation was enacted granting an action for injunc-

tion and for damages to any person whose name or picture is used, "for advertising purposes or for the purposes of trade", without first obtaining the written consent of the person whose name or picture is thus used. Section 51, Civil Rights Law of the State of New York, McK.Consol.Laws, c. 6.

In establishing the right to an injunction or for damages for the unauthorized use of a person's name, portrait or picture, Section 51 of the Civil Rights Law, as construed by state court decisions, did not create a property interest. In Gautier v. Pro-Football Inc., 278 App.Div. 431, 106 N. Y.S.2d 553, 560, the court construed the scope of the statute in the following language:

"The statutory creation in this state of a limited right of privacy was intended for the protection of the personality of an individual against unlawful invasion. See Roberson v. Rochester Folding Box Co., 171 N.Y. 538, 64 N.E. 442, 59 L.R.A. 478; Rhodes v. Sperry & Hutchinson Co., 193 N.Y. 223, 85 N.E. 1097, 34 L.R.A.,N.S., 1143, affirmed 220 U.S. 502, 31 S.Ct. 490, 55 L.Ed. 561. It provided primarily a recovery for injury to the person, not to his property or business. * * * True, where an individual's right of privacy has been invaded there are certain other elements which may be taken into consideration in assessing the damages. Thus, where a cause of action under the Civil Rights statute *has been established,* damages may include recovery for a so-called 'property' interest inherent and inextricably interwoven in the individual's personality, see Redmond v. Columbia Pictures Corp., 277 N.Y. 707, 14 N.E.2d 636 [supra], but *it is the injury to the person not to the property which establishes the cause of action.* That is the focal point of the statute.

"There is no right of privacy, under our statute, applicable to a business * * *. It is the individual, not his business, which is protected against unlawful intrusion. * * * Section 51 of the Civil Rights Law was not en-

acted to fill gaps in our copyright statute, or to supplement causes of action based on contracts express or implied or to extend the law relating to unfair competition or to the appropriation of another's business or enterprise. Jaccard v. R. H. Macy & Co., Inc., 265 App.Div. 15, 37 N.Y.S.2d 570." (Emphasis added.)

Pekas Co., Inc., v. Leslie, 52 New York Law Journal, 1864 (February 13, 1915) is very pertinent, for the very question was considered by Justice Greenbaum. It appeared that the plaintiff, a publisher of posterettes, art stamps and advertising stamps, secured from certain motion picture actresses the exclusive right to use their pictures on posterettes, art stamps, advertising stamps and seals for a period of five years. The defendant thereafter also published, without the permission of the actresses, posterettes or portrait stamps of the same actresses. Just as in the pending case, it appeared that these actresses had not authorized the plaintiff "to bring any action for injunction or damages against said defendants, or either of them". Indeed the actresses filed affidavits which contained a request that no injunction be issued in the action. No copyright question was involved, and the judge wrote:

"The complaint is clearly predicated upon the theory that the defendants are liable to plaintiff under sections 50 and 51 of the Civil Rights Law, entitled 'Rights of Privacy'. The history of the legislation resulting in that act is found in Rhodes v. Sperry & Hutchinson Co., (193 N.Y. 223 [85 N.E. 1097, 34 L.R.A.,N.S., 1143]), which convincingly established that it was prompted by the suggestions of the court in Roberson v. Rochester Folding Box Co. (171 N.Y. 538 [64 N.E. 442, 59 L.R.A. 478]). A study of the learned prevailing opinion in the Roberson case (supra) clearly reveals that the 'Law of Privacy' is what the phrase indicates, not one designed to protect the rights of private property, but 'of an inviolate personality,' based upon the regard of the

law for the feelings and sentiments of the individual. The rights and remedies of the persons aggrieved are purely personal and not assignable. Rights for outraged feelings are no more assignable than would be a claim arising from a libelous utterance. The alleged agreements made between the actresses in question and the plaintiff, under which the plaintiff was given the exclusive right to publish the portraits, may have conferred rights which the plaintiff might have protected by copyright, but none in favor of the plaintiff against the defendants under the Civil Rights Law of Privacy. Judgment for the defendants without costs."

This opinion is of such importance that the plaintiff has supplied the court with photostat copies of the pleadings, briefs, findings, conclusions and judgment therein, but an examination of these papers does not change the conclusion forced by the foregoing consideration of the facts and law.

A federal case which follows the New York law, though the contract under consideration was not negotiated in New York, is of considerable interest, for the facts are very similar to those in this case, see Hanna Mfg. Co. v. Hillerich & Bradsby Co., 5 Cir., 78 F.2d 763, 766, certiorari denied 296 U.S. 645, 56 S.Ct. 248, 80 L.Ed. 458. It appeared that certain baseball players had given to Hillerich & Bradsby Co., manufacturers of baseball bats, the exclusive right to use their names and photographs in connection with the sale of baseball bats, and had consented to the registration of their names as trade-marks. The defendant, Hanna Mfg. Co., was selling baseball bats under the designation "Ruth" or "Gehrig" bats, which indicated special bats known to the trade under those names. Judge Sibley, writing for the Court of Appeals, said:

" * * * From this incomplete review it is evident that a famous batsman, aside from questions of trademark and unfair competition or libel, might have difficulty in keeping his name and likeness from respectful use

by others. But if they be his property in a sense, they are not vendible in gross so as to pass from purchaser to purchaser unconnected with any trade or business. Fame is not merchandise. It would help neither sportsmanship nor business to uphold the sale of a famous name to the highest bidder as property. Moreover, appellee is not by its contracts the assignee as of property of the name and likeness of these players. The usual form of the contract grants 'the sole and exclusive right for twenty years of the use of my name, autograph, portrait, photograph, initials or nickname for trade-mark or advertising purposes in connection with the manufacture or sale of baseball bats.' The signer does not divest himself of his name and likeness, but gives a permission or license to use them for a stated purpose and for a limited time. Since the players were not makers or sellers of bats and sold no business together with its marks and good will to appellee, *the contracts in our opinion in and of themselves operate only to prevent the signers from objecting to appellee's use of their names and likeness.* The right or wrong as against appellee of their use by others rests on the law of trade-mark and unfair competition, or unfair trade, and depends not so much on appellee's contracts as on the actual use in trade by appellee of the names and likenesses. It is the trade rather than the names and likenesses which the law will protect as property." (Emphasis added.)

Cases cited by the plaintiff do not change this view. Fisher v. Star Co., 231 N.Y. 414, 132 N.E. 133, 19 A.L.R. 937, holds that a cartoonist who originates the names of fictitious grotesque characters acquires a peculiar value in interesting the public through newspaper publications, and may enjoin other publishers from using the names and imitating his drawings for the purpose of leading the public to believe that their work is his. This is not a case in which the third party under contract to the cartoonist pursued the invader.

Nor does Wood **v.** Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214, help the plaintiff, for the facts were quite different. The same is true of Rogers v. Republic Productions, Inc., D.C.S.D.Cal., 104 F.Supp. 328, and the case of Uproar Co. v. National Broadcasting Co., 1 Cir., 81 F.2d 373, certiorari denied 298 U.S. 670, 56 S.Ct. 835, 80 L.Ed. 1393. And plaintiff relies also on Reiner v. North American Newspaper Alliance, 259 N.Y. 250, 181 N.E. 561, 83 A.L.R. 23.

In Wood v. Duff-Gordon, supra, the plaintiff had acquired the exclusive right to place Lady Duff-Gordon's endorsement on the designs of others, and to place her own designs on sale. Lady Duff-Gordon placed her endorsement on fabrics, dresses and millinery without plaintiff's knowledge, and withheld the profits, for which she was sued. The question whether there was an enforceable contract was presented and the Court of Appeals held that there was. Rogers v. Republic Productions, supra, involved property in commercial advertising.

In Reiner v. North American, supra, the facts are quite different from those presented in this case. There the plaintiff had fraudulently obtained passage on the Graf Zeppelin, and had agreed that he would not broadcast news of the trip, for the owners of the ship had given the exclusive news rights to a third party. Nevertheless it appeared that Reiner had entered into a contract to send "radio messages from the said Graf Zeppelin to friends in the United States in reply to messages sent to plaintiff by his friends and the defendant promised and agreed to pay the plaintiff $5,000 therefor". Plaintiff performed and defendant refused to pay. It was held that the acts of the plaintiff constituted a tort; that the contract between plaintiff and defendant was a part of the scheme which resulted in the breach of contract of the passage entered into by plaintiff, and interfered with the contract between the owners of the Graf Zeppelin and the third party. The court held that plaintiff's contract with the defendant was illegal. It was said:

"A court will not lend aid to a party who has committed a tort to enable him

to recover from another the price agreed to be paid for his wrongful act. * * * "

The contracts between the ball players and the plaintiff here did not call for the performance of any services on the players' part. Nor did they require the players to endorse the plaintiff's product. It is also significant that there is absent any substantial evidence proving that through the plaintiff's efforts, time and money, the baseball players' picture cards have acquired a special significance which would associate them in the minds of the buying public with the plaintiff or its product. Proof of such circumstances might well bring the case within the principle which formed the basis for granting protection to the defendant against the unauthorized use by the plaintiff of the name "Graham" in Uproar Co. v. National Broadcasting Co., D.C., 8 F.Supp. 358, affirmed 1 Cir., 1936, 81 F.2d 373, certiorari denied 298 U.S. 670, 56 S.Ct. 835, 80 L.Ed. 1393. The District Court had the following to say in its opinion on this point [8 F.Supp. 360]:

"The defendant National Broadcasting Company through its artist's service, has created a commercial value in the name 'Graham McNamee.' He has been identified with the National Broadcasting Company for several years, and has never been identified with any other broadcasting company. * * * The use of the word 'Graham' would, in the public mind, mean Graham McNamee, especially if used in connection with the radio program sponsored by the Texas Company.

\* \* \* \* \* \*

"The name has acquired, through the efforts of McNamee and the National Broadcasting Company, a very substantial value, especially valuable for advertising purposes; and this definite commercial value exists apart from the services as radio announcer. Rights of a pecuniary nature have been created which partake of the elements of property rights, and which will receive the protection of equity. International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 72, 63

L.Ed. 211, * * *. These rights may properly be the subject-matter of a transfer from McNamee to the broadcasting company."

Implicit in the decision in the Uproar case is the suggestion that the use of the name "Graham" by the plaintiff amounted to an appropriation of good will created by the defendant broadcasting company at great expense and that such appropriation constituted unfair competition.

Thus it may be said that before the enactment of Sections 50 and 51 of the Civil Rights Law, there was in New York no legal basis for protection against the unauthorized use of a person's name or portrait (in the absence of a violation of the law dealing with libel and slander, or some independent property or contract right). With the enactment of Sections 50 and 51, the legislature granted certain limited protection against unauthorized publication of a person's name or picture; that is, where the intended use is "for advertising purposes or for the purposes of trade". The protection thus granted by statute is a right of privacy, construed by the courts of the state as being a purely personal right and non-assignable. See Murray v. Gast Lithograph & Engraving Co., 8 Misc. 36, 28 N.Y.S. 271; affirmed 10 Misc. 365, 31 N.Y.S. 17; Wyatt v. Hall's Portrait Studio, 71 Misc. 199, 128 N.Y.S. 247.

The plaintiff denies that its claim is based upon a violation of the right of privacy statute. It insists that by virtue of its contracts with the ball players it obtained rights in the nature of a property interest which is entitled to protection. However, the cases plaintiff cites all involve property or contract rights independent of the right obtained through contract to the use of names and pictures for the purposes of trade or for advertising purposes.

I conclude that the plaintiff has failed to sustain the cause of action alleged.

By the same token the defendant's rights in and to its contracts were, of course, no greater in matter of law than those acquired by the plaintiff. That is to say that the defendant, like the plaintiff, failed to acquire from the players the right

to pursue third parties. As to the other branch of defendant's counterclaim seeking cancellation of plaintiff's registered trade-mark, that too must fail, because at least on the face of it the trade-mark covers registerable matter.

The complaint and defendant's counterclaim will be dismissed. Settle decree on notice.

Appropriate findings of fact and conclusions of law will be filed with this opinion.